[No. 19855-0-II. Division Two. December 20, 1996.]

JOHN R. WILSON, *Respondent*, v. THE STATE OF WASHINGTON, ET AL., *Appellants*.

---

[15]LAWS OF 1995, ch. 347, § 701-15 (codified at RCW 36.70C.005-900).

*Christine O. Gregoire, Attorney General,* and *Carol A. Murphy, Michael E. Tardif,* and *Delbert W. Johnson, Assistants,* for appellants.

*Paul A. Lindenmuth, Ralph Seeley,* and *Law Offices of Neil J. Hoff,* for respondent.

SEINFELD, C.J. — John Wilson, a pharmacist at Western State Hospital, claimed that Hospital management

wrongly removed him as director of the pharmacy department in retaliation for certain comments he made regarding personnel management. A jury agreed and awarded Wilson $9,000,000 for this violation of his constitutional right to free speech. We hold that the Hospital's interest in proper personnel management outweighs the minor "public concern" content of Wilson's comments. Accordingly, Wilson's speech was not protected by the First Amendment and the trial court erred in submitting the free speech claim to the jury. Thus, we reverse with directions to dismiss.

## FACTS

When the Hospital hired Wilson as director of its pharmacy department, it was experiencing difficulties with its Medicare certification and its accreditation by the Joint Commission on Accreditation of Healthcare Organizations. The loss of the certification and accreditation could have cost the Hospital about $40 million in annual revenue from the federal government. As the pharmacy's director, Wilson had supervisory and management responsibility, but his job description and pay scale were the same as the Hospital's other clinical pharmacists.

Wilson took several steps to bring the pharmacy into compliance with federal requirements. He developed policies and procedures; designed a degree-blind, skills-based pharmacist credentialling system; and implemented several workload measurement systems. The pharmacy department improved during Wilson's tenure, and Wilson received positive performance evaluations.

Wilson added two clinical pharmacists to the staff: Kathleen Williams and David Watson. Wilson encouraged Williams during her first two years. He promised that he would give her more desirable assignments as she developed her expertise and passed the competency examination he had developed. In particular, he said he would reduce the number of hours that she was required to

dispense drugs, allowing for an increase in clinical work, the more sought after assignment. But this did not occur.

Wilson continued to require Williams to dispense drugs 14 hours per week but limited Watson's dispensing time to a maximum of 10 hours per week. Although Watson had not taken the competency examination and despite Wilson's own "degree-blind" credentialling system, Wilson justified this discrepancy by pointing to Watson's pharmacy degree and postdoctoral training.

Williams complained to Wilson, requesting him to equalize the dispensing hours. When Wilson failed to respond, Williams addressed a written complaint to Dr. Darrell Hamilton, former Hospital superintendent, and then current director of professional services. Dr. Hamilton agreed with Williams and directed Wilson to equalize the dispensing time and provide dispensing time data for each of the clinical pharmacists.

Displeased, Wilson discussed the situation with his pharmacy management team and decided to write a "White Paper" to "educate this man . . . . [because h]e doesn't understand gender discrimination criteria." Wilson argued that adjusting Williams's dispensing time would destroy his management system, leading to poorer patient care: "I would have every other pharmacist in the department coming in and saying, well, now I want this and I want that, and we just couldn't — it would have just caused a terrible situation among our staff. It just would have been unworkable, totally unworkable."

When Wilson failed to provide the data, Dr. Hamilton directed him to stop workload measurement procedures because they were counterproductive and to equalize Williams's and Watson's dispensing times. As a result, Wilson threatened to resign.

In response, John Reynolds, the Hospital's new superintendent, met separately with Wilson, and then with Wilson, Williams and Travis Aiken, the Hospital's personnel officer. Following these meetings, Reynolds requested an Office of Equal Opportunity (OEO) investigation and asked Wilson to try to reconcile with Williams.

Wilson met with Williams but the meeting apparently was unsatisfactory as Williams proceeded to file a gender discrimination complaint with OEO. The OEO investigated the claims and then recommended that the Hospital equalize Williams's dispensing time with Watson's. It also proposed a settlement. Although Williams and Aiken approved the proposal, Wilson refused to agree to it.

About five months after Williams's initial complaint, 11 of the Hospital's 14 pharmacy technicians signed a union-sponsored grievance against Wilson attacking his management practices. Wilson alleged that Williams incited the technicians to grieve and provided them with information supporting their complaint.

After efforts to resolve the grievance failed, Dr. Hamilton, then Director of Professional Services, temporarily removed Wilson. To gain a better understanding of the situation, Dr. Hamilton decided to manage the department himself. He also brought in two outside consultants, Dr. Paul Burkhart, the pharmacy director at the University of Washington Medical Center, and Richard Ager, the pharmacy director at Eastern State Hospital. The consultants recommended a department reorganization and apparently suggested that, under the circumstances, Wilson could no longer be an effective manager.

Dr. Hamilton removed Wilson as director and reassigned him to another pharmacy position with equal pay. Williams was the only clinical pharmacist interested in the then-vacant director position so Dr. Hamilton appointed her as the new director.

When Wilson returned after several months from a leave of absence, he worked under Williams's supervision and, according to Wilson, was poorly treated. There were no private offices available at that time so, Wilson had to work at a desk near the reception area. Wilson testified that this was demeaning and embarrassing. Further, Wilson claimed that Watson secretly tape recorded a meeting between the two of them and stole one of his computer disks.

Sometime later, Dr. Ira Klein became Wilson's supervisor. Wilson contends that Dr. Klein offered him additional postdoctoral training, but later delayed in following through on the offer. Eventually, Dr. Klein agreed to the training if Wilson would agree to submit a postdated letter of resignation. Wilson declined on the grounds that this would be unethical.

At this point, Dr. Klein resigned. Dr. Hamilton, his new supervisor, directed Wilson to work on extracting pharmaceutical profile information from patient charts in the medical records department. His salary and benefits remained the same. Wilson, however, claimed that this task was demeaning and beneath his professional skill level; that the physical work environment was an unpleasant basement room; and that he was not adequately equipped as he did not have a private phone, a computer, or library access.

Meanwhile, Wilson received two outside research grants that required much of his time. To accommodate his schedule, Hospital administration permitted Wilson to work less than half-time and later allowed him to reduce his work hours to 10 hours per week.

Dissatisfied, Wilson sued the State of Washington, Dr. Hamilton, Williams, Watson, and Reynolds (the defendants). He claimed that his comments "against settling a false and frivolous claim of gender discrimination . . . constituted speech on matter of public concern protected by the 1st Amendment and the public policy of the State of Washington." He alleged that the defendants, "[i]n retaliation for said advocacy," "demoted" him by removing his director responsibilities and engaged in a civil conspiracy.[1] The jury found for Wilson on the free speech and civil conspiracy claims and awarded him $400,000 in eco-

---

[1]At various points throughout the proceedings, the trial court dismissed Wilson's claims of fraudulent misrepresentation, gender discrimination, due process violations, harassment, defamation, tortious interference with a business relationship, and outrage. Wilson does not appeal the dismissal of any of these claims.

nomic damages, $8,000,000 in non-economic damages, and $600,000 in punitive damages[2]

The defendants contend that the trial court erred in allowing the jury to decide the free speech claim as Wilson's comments were not protected speech. They also challenge the trial court's denial of their motion to dismiss the civil conspiracy claim for insufficient evidence.

## FREE SPEECH CLAIM

When a public employee claims a violation of free speech, the court must consider and resolve the tension between two competing interests. *Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). On the one hand, public employees have a First Amendment right to comment on matters of public interest, even when such speech involves the agencies who employ them. *Pickering,* 391 U.S. at 568. On the other hand, public employers have a legitimate interest in fulfilling their public mission and must be able to act accordingly. *Pickering,* 391 U.S. at 568.

██ Initially, the employee claiming a free speech violation must show that the speech in question is entitled to constitutional protection. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Here, Wilson claims that his comments about the management of the pharmacy department, as set out in the "white paper," deserve such protection.

To determine whether the Constitution protects this speech, the court must ask: (1) Does the speech deal with a matter of public concern?; (2) If so, is the employee's free speech interest greater than his employer's interest in promoting the efficiency of the public services it performs?; (3) If so, was the speech a substantial motivating factor in his discharge or transfer?; and (4) If so, in the absence of

[2]Two hundred thousand dollars each against Dr. Hamilton and Reynolds; $100,000 each against Williams and Watson.

the protected speech, would the employer have made the same decision? *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Binkley v. City of Tacoma*, 114 Wn.2d 373, 382, 787 P.2d 1366 (1990).

## I

### PRESERVATION

Defendants contend that the trial court erred by permitting the jury to determine the first two elements of the inquiry. Wilson claims that the defendants did not preserve this issue for appeal. The defendants did not raise the issue before the trial court by moving for dismissal at the close of Wilson's case or for a directed verdict at the end of their own case. They did, however, move for dismissal of Wilson's First Amendment claim, thereby giving the trial court the opportunity to consider and rule on the issue. Accordingly, we too will consider it. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 291, 840 P.2d 860 (1992); *Bennett v. Hardy*, 113 Wn.2d 912, 917, 784 P.2d 1258 (1990); *East Gig Harbor Improvement Ass'n v. Pierce County*, 106 Wn.2d 707, 709 n.1, 724 P.2d 1009 (1986).

## II

### PUBLIC CONCERN

The trial court, not the jury, must decide, as a question of law, whether speech relates to an issue of public concern. *Rankin v. McPherson*, 483 U.S. 378, 386 n.9, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); *Binkley*, 114 Wn.2d at 382; *Edwards v. Department of Transp.*, 66 Wn. App. 552, 560, 832 P.2d 1332 (1992). Thus, the trial court erred in allowing the jury to decide this question and we review the issue de novo. *Connick*, 461 U.S. at 148 n.7, 150 n.10; *Binkley*, 114 Wn.2d at 373.

The employee has the initial burden of proving that the speech touches on matters of public concern. *Connick*, 461 U.S. 147-48; *Binkley*, 114 Wn.2d at 382. If the employee fails to bear that burden, the inquiry ends. *Ferrara*

*v. Mills*, 781 F.2d 1508, 1512 (11th Cir. 1986). In deciding whether Wilson met this burden, we look to the content, form, and context of the speech as revealed by the entire record. *Connick*, 461 U.S. at 147-48. We also consider the speaker's intent — did he mean to raise an issue of public concern or simply intend to further a personal interest? *Edwards*, 66 Wn. App. at 560.

Mere cloaking of otherwise private matters in the mantle of public concern is insufficient to raise First Amendment concerns. *Connick*, 461 U.S. 147-48; *Binkley*, 114 Wn.2d at 387. An employee who acts as a concerned citizen interested in bringing problems to light more likely raises a matter of public concern than does one who attempts to rectify work place problems. *Binkley*, 114 Wn.2d at 385. Further, speech that occurs during the discharge of an employee's duties likely does not touch on matters of public concern. *Koch v. City of Hutchinson*, 847 F.2d 1436 (10th Cir.), *cert. denied*, 488 U.S. 909 (1988). Likewise, speech that offers the speaker's personal opinions or beliefs does not implicate matters of public concern, especially when it occurs in the work setting. *Koch*, 847 F.2d at 1447. Finally, a speaker who is part of management and is thereby obligated to implement its policies but who, instead, criticizes the policies and refuses to support them, might not be able to call upon the First Amendment for protection. *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983).

These guidelines indicate a judicial sensitivity to the adverse consequences of providing constitutional protection for all statements made by public employees. *Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988), *cert. denied*, 489 U.S. 1053 (1989). Uncontrolled employee debate about the wisdom of internal office decisions could seriously impact productivity and affect the public institution's ability to carry out its mission. *Knapp v. Whitaker*, 757 F.2d 827 (7th Cir.), *cert. denied*, 474 U.S. 803 (1985). Also, if every comment was of public concern and deserving of constitutional protection, every institutional response to a com-

ment could provoke judicial scrutiny. *Berg*, 854 F.2d at 242.

Wilson argues that his comments relate to the quality of care that State mental hospital patients receive and, thus, are a matter of public concern. He contends that a failure to follow his work assignment plan would directly affect the care received by the Hospital's patients.

Of course, the quality of patient care provided by state institutions is of public concern. But Wilson's speech is not clearly connected to the provision of quality patient care. *See Mahaffey v. Kansas Bd. of Regents*, 562 F. Supp. 887, 890 (D.C. Kan. 1983) (invoking a presumed public interest in the way public institutions are run, alone, is not sufficient to transform a personal matter into one of public concern); *Meyer v. University of Wash.*, 105 Wn.2d 847, 851, 719 P.2d 98 (1986) (individual grievance is not converted to issue of public concern by invoking a popular interest in the way public institutions are run).

Several federal court decisions are helpful in applying the public concern guidelines to the facts at hand. The Seventh Circuit concluded that a teacher's speech criticizing class size and the lack of discipline, while of general interest to the public, was not a matter of public concern because the teacher intended her speech "to benefit only her personal interests in a private dispute with her employer." *Cliff v. Board of Sch. Comm'rs.*, 42 F.3d 403, 409 (7th Cir. 1994). The *Cliff* court noted that the teacher complained only in response to criticism directed at her; she stated her complaint in the context of her own circumstances rather than in general terms; nothing indicated that she was speaking for teachers as a whole; and the teacher made no effort to call public attention to the matter. *Cliff*, 42 F.3d at 410-11.

The Eleventh Circuit reviewed a case brought by a nurse-manager who alleged the hospital retaliated against her for speech concerning contaminated surgical instruments left in a surgical corridor. *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1276 (11th Cir. 1992).

The *Pearson* court found the nurse's speech motivated by her own personal interest in maintaining her position and not being reprimanded. *Pearson*, 952 F.2d at 1278-79. Consequently, it determined that the speech was not protected by the First Amendment. *See also Ballard v. Blount*, 581 F. Supp. 160, 164 (N.D. Ga. 1983) (teacher's remarks about the manner in which teachers were assigned to classes, and development and approval process for syllabus are private issues even though plaintiff contended they could have an affect on the public), *aff'd.*, 734 F.2d 1480, *cert. denied*, 469 U.S. 1086 (1984); *Knapp*, 757 F.2d 827; *Ferrara*, 781 F.2d 1508; *Mahaffey*, 562 F. Supp. 887 (teachers' criticism of class assignments not a matter of public interest despite contentions that assignments detrimentally affect students' educational process).

Here, Wilson directed his "white paper" to Dr. Hamilton, referring to it as "RESPONSE TO DR. KATHLEEN WILLIAMS['S] CONCERNS." The "white paper" contains the following four major sections: a summary, background information, an assessment, and recommendations. The summary section restates Williams's complaints and Wilson's responses. The background information section describes the then-current status of hospital pharmacy practice, the philosophy Wilson used to decide pharmacist assignments, comments about Williams's work and likely future assignments, Wilson's recruiting efforts, Williams's philosophical concerns about Wilson's use of pharmacists, and a discussion of the Hospital's past, current and future reputation.

The assessment section focuses specifically on the dispute with Williams. For example, point one begins, "Dr. Williams has misstated her situation to you . . . ." Point three states that "The hiring and task assignments of Dr. Watson were well justified . . . ." Wilson then comments about his goal to reorganize the department and his concern that implementing Williams's request would set "a dangerous precedent," undermine his role, and undermine the credentialling process. Wilson then devotes

one full page of the five-and-one-half page document to restating and responding to Williams's seven specific concerns.

The recommendation section contains six points, four of which are requests regarding the Williams controversy. Point three asks for immediate implementation of a "pharmacist workload measuring system" and point six asks for a formal review by the chair of pharmacy practices at the University of Washington or Washington State University.

Applying the *Connick* content, form, and context analysis, it is apparent that the "white paper's" content involves an internal office matter that affected Wilson's position within the Hospital. Wilson's speech, like that of the plaintiffs in *Ballard, Knapp, Ferrara, Mahaffey* and *Cliff*, is a criticism of the allocation of human resources. Wilson, like the plaintiffs in *Cliff, Ballard, Knapp, Ferrara*, and *Mahaffey*, attempts to link his speech to the broader issue of patient care in order to invoke the mantle of public concern. The "white paper," however, basically is a justification of Wilson's administrative decisions and personnel assignments.

The form of the speech is a memo to Wilson's superior, Dr. Hamilton. Like the speech in *Cliff*, the comments are addressed solely to an internal audience. There is no indication of an intent to bring a problem to the public's attention.

The context in which Wilson wrote the "white paper" reinforces the conclusion that Wilson was dealing with an issue that affected his position at the Hospital, and only indirectly with the general welfare of hospital patients. Wilson wrote his "white paper" after Hospital administration responded to Williams's complaint about her work assignment and her suggestion that she was a victim of gender discrimination. As Wilson himself stated, the administration's response threatened to undermine his role and responsibility.

Evidence as to Wilson's intent in writing the "white

paper" comes from its content, form, and context. The above analysis of those three factors suggests that Wilson was seeking to rectify workplace problems related to the discharge of his duties. The "white paper" contains his personal opinion as to the most desirable way to organize the pharmacy department. In summary, we see no significant difference between Wilson's speech and that of the plaintiffs in the foregoing cases. Thus, we conclude that the "white paper" raises issues of personal, not public, concern.

All of the cases that Wilson cites are factually distinguishable from the instant case.[3] In each, the plaintiff charged misfeasance, malfeasance or nonfeasance by a public officer. In each, the plaintiff attempted in some fashion to bring the claim to the public's attention. In each, plaintiff's speech invoked a broad public issue that only tangentially affected the plaintiff's position within the organization. And in each, a successful resolution of the plaintiff's claim would have brought the plaintiff little

---

[3]*Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979) (dismissal of teacher who publicly charged racially discriminatory policies and practices within school district); *Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir.) (firing of county employee who made statements to coworkers and others accusing her supervisor of mismanagement and possible criminal conduct), *cert. denied*, 515 U.S. 1161 (1995); *Kincade v. City of Blue Springs*, 64 F.3d 389 (8th Cir. 1995) (dismissal of city engineer whose report to Board of Aldermen criticized engineering and construction of dam and misuse of public funds), *cert. denied*, 517 U.S. 1166 (1996); *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992) (termination of probation department volunteer who criticized juvenile hall conditions to judges), *cert. denied*, 508 U.S. 908 (1993); *Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989) (discharge of county employee who complained of supervisor's sexual harassment and problems with alcohol); *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401 (9th Cir. 1988) (discharge of physician hired to correct deficiencies in alcohol abuse unit who repeatedly reported wastefulness, mismanagement, unethical conduct, violations of regulations and incompetence); *Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) (termination of city inspector who cited facility for public safety hazard violations and who reported his supervisors for using city employees to perform private and political campaign work); *Cox v. Dardanelle Pub. Sch. Dist.*, 790 F.2d 668 (8th Cir. 1986) (dismissal of teacher who spoke publicly about school policies and practices); *McKinley*, 705 F.2d 1110 (firing of police officer who publicly criticized the city's decision to not give annual raises); and *White v. State*, 78 Wn. App. 824, 898 P.2d 331 (1995) (transfer of administrative assistant who reported case of suspected patient abuse), *review granted*, 128 Wn.2d 1024 (1996).

more than the personal satisfaction of performing a public service. Moreover, none of the plaintiffs' speech occurred in the context of an ongoing management dispute.

Here, Wilson threatened that failure to make personnel decisions in accordance with his management plan would be detrimental to the Hospital. He was not seeking to inform the public that the administration was derelict in serving Hospital patients. Rather, he was justifying his own actions and philosophy and attempting to protect his own position. Although the general topic of quality patient care is one of public import, the connection between that topic and Wilson's speech is tenuous. Accordingly, we conclude that Wilson made his comments on behalf of his own interest and the speech was not of public concern.

## III
### WEIGHING THE STATE'S INTEREST

■ Even were we to assume the speech had some public concern value, the Constitution would not afford Wilson protection unless that value was greater than the Hospital's interest in fulfilling its mission. *Connick*, 461 U.S. at 147-8. This also is a question of law for the trial court to determine. *Rankin*, 483 U.S. at 386; *Binkley*, 114 Wn.2d at 382. Again, we review the issue de novo. *Connick*, 461 U.S. at 151 n.10.

■ The extent to which the employer must justify its competing interest is reduced by the magnitude of the employee's speech. *Binkley*, 114 Wn.2d at 383. Where the employee's speech is only tangentially of public concern, the employer's burden is lighter. *Binkley*, 114 Wn.2d at 383. The time, manner, place, and context of the employee's speech are also relevant factors in the analysis. *Rankin*, 483 U.S. at 388.

Here, the Hospital's interest in having its employees efficiently and properly fulfill the Hospital's legal function clearly outweighs the slight public concern value of Wilson's speech. *Pickering*, 391 U.S. 563. The Hospital has

a duty to resolve employee grievances and to maintain a discrimination-free work place. RCW 49.60.180(2), (3). It also has an interest in avoiding disruption and assuring compliance with management decisions. *Connick*, 461 U.S. at 151; *Binkley*, 114 Wn.2d at 385; *Rankin*, 483 U.S. at 388. A public employer needs wide discretion and control over the management of its operation. *Connick*, 461 U.S. at 151. These interests were frustrated by Wilson's refusal to comply with his supervisor's requests.

Upon reviewing the facts and circumstances in context, it is clear that the Hospital's management decisions were appropriate in light of its mission. After Williams complained of unequal treatment, the Hospital had a duty to investigate and respond. RCW 49.60.180(2), (3). Ultimately, the Hospital administrators had the authority and responsibility to resolve this personnel dispute and to assure compliance with their directives. Wilson's recalcitrance could have seriously impaired the Hospital's ability to maintain a harmonious and discrimination-free work place.

In sum, the degree of public concern related to Wilson's speech was slight while the Hospital's interest in effective management and in not violating another employee's employment rights was significant. Constitutional protection for Wilson's speech would hinder management's ability to carry out its responsibilities. Thus, we conclude that the Hospital's legitimate interests outweighed any free speech interest that Wilson had in his "white paper" comments, and that Wilson's speech was not entitled to constitutional protection. Accordingly, Wilson's First Amendment claim fails as a matter of law.

## IV

### QUALIFIED IMMUNITY

Additionally, defendants claim that the doctrine of qualified immunity shields them from liability. Wilson asserts that the defendants waived this affirmative defense by their failure to plead it.

Qualified immunity is immunity from suit, not immunity from liability. *Alvarado v. Picur*, 859 F.2d 448, 451 (7th Cir. 1988). Its purpose is to protect the individual government employee from the inhibiting effect that the fear of personal liability might create. *Savage v. State*, 127 Wn.2d 434, 446, 899 P.2d 1270 (1995). It does not apply to the State when, as here, the State is sued in its respondeat superior capacity. *Savage*, 127 Wn.2d at 436. Thus, the trial court did not err in denying the State's motion for a judgment notwithstanding the verdict on this ground.

We engage in a different analysis when we consider the applicability of the doctrine to the individual defendants. First, we note that a defendant may raise the defense at any stage of the litigation, including by posttrial motion. *Krause v. Bennett*, 887 F.2d 362, 368 (2d Cir. 1989); *Alvarado*, 859 F.2d at 451 n.3. As the defendants here raised the issue at the close of their case and again in a memorandum supporting their motion for judgment notwithstanding the verdict, they did not waive the issue.

Public officials are immune from suit unless the "law clearly proscribed the actions" they took. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). This means that the doctrine is not applicable to defendants if, by their conduct, they violated a clearly established constitutional right of which a reasonable person would have been aware. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987), *aff'd.*, 922 F.2d 443 (8th Cir. 1990).

The applicability of qualified immunity to a particular individual is a question of law. *White v. State*, 78 Wn. App. 824, 837, 898 P.2d 331 (1995), *review granted*, 128 Wn.2d 1024 (1996). A plaintiff seeking to rebut a defendant's claim of qualified immunity must demonstrate that the defendant's conduct interfered with a clearly established constitutional right. *White*, 78 Wn. App. at 837. "Clearly established" means that the contours of the right were so obvious at the time the official acted that a reasonable official would have understood that what he was

doing violated that right. *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988) (citing *Anderson*, 483 U.S. at 640). Thus, the plaintiff "must do more 'than identify a clearly established legal test and then allege that the defendant has violated it. The plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.' " *Altshuler v. City of Seattle*, 63 Wn. App. 389, 395, 819 P.2d 393 (1991) (quoting *Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990)), *review denied*, 118 Wn.2d 1023 (1992)

An employee has a clearly established right to speak on an issue of public interest. *Brawner*, 855 F.2d at 192-93. And case law protects a public employee's speech that reveals the improper conduct of co-workers. *Brawner*, 855 F.2d at 193. But the record in this case does not support the conclusion that Wilson's speech fits within these categories.

First, as we discussed in section II, Wilson's comments about the pharmacy's administrative structure do not qualify as speech of public concern. Second, a reasonable hospital administrator/manager dealing with Wilson's refusal to follow administrative directives would not have understood that he or she was violating Wilson's free speech rights by reassigning him to another position of equal pay within the organization. To the contrary, a prohibition against the removal of a nonresponsive manager would be unreasonable and could easily lead to organizational chaos. Thus, Wilson has failed to show that defendants interfered with his "clearly established" constitutional free speech rights. Consequently, the individual defendants may claim the defense of qualified immunity.

## V

### CIVIL CONSPIRACY

To establish a civil conspiracy, Wilson must prove by clear, cogent and convincing evidence that (1) two or

more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy. *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 528-29, 424 P.2d 290 (1967). Mere suspicion or commonality of interests is insufficient to prove a conspiracy. *Corbit*, 70 Wn.2d at 529.

Wilson conceded that the removal of his working title and reassignment was not unlawful. It follows then that he seeks to prove the conspiracy by the second prong — that his removal and transfer was accomplished by unlawful means. To support this, he offers, as the illegal acts, Watson's secretive taping of their meeting, Watson's alleged theft of his computer disk, and defamation.

## A. Secret Taping and Theft of Computer Disk

Viewing the evidence in a light most favorable to Wilson, and recognizing that Watson's taping and computer disk appropriation may have been illegal, there is no evidence that anyone other than Watson was involved in these acts. Thus, these acts cannot support the conspiracy theory.

## B. Defamation

To show defamation, Wilson alleges that Williams said he was "out to get the technicians." Without more, this is not defamatory. Moreover, according to the record, Williams never made this statement; another individual did.

## C. Technicians' Grievance Against Wilson

Finally, we discuss whether evidence of the technicians' grievance against Wilson supports his conspiracy claim. Wilson did not specifically cite this to support the claim either in his appellate brief or in oral argument. He did, however, include comment about this incident in his discussion of the facts. Assuming that Wilson intended

this comment as argument, we find the argument lacks merit.

As we stated above, a plaintiff seeking to prove conspiracy must show that two or more people combined to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Wilson provided no authority that Williams, if she did communicate with the technicians about their grievance, acted unlawfully. Williams testified that any information she provided to the technicians was necessary to the discharge of their duties. Two other pharmacy technicians testified that the technicians decided to file the grievance because they failed to obtain a satisfactory resolution of identified concerns and that filing a grievance was the "next step." Wilson's mere suspicions will not support his conspiracy theory.

As we find no evidence of any illegal act by two or more individuals, the civil conspiracy claims also fails.

We vacate the judgment and remand with instructions to dismiss the action.

MORGAN and BRIDGEWATER, JJ., concur.

Review denied at 131 Wn.2d 1022 (1997).