# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CHAMBERS CREEK LLC, a limited liability company registered to do business in Washington, | No. 46898-1-II |
| Appellant, | |
| v. | |
| CHARLES SCHMIDT; and ANTHONY SCHMIDT, | UNPUBLISHED OPINION |
| Respondents. | |

JOHANSON, C.J. — Chambers Creek LLC (Chambers) appeals the trial court's order granting summary judgment to Anthony and Charles Schmidt (collectively the Schmidts) on Chambers' claims for civil conspiracy and conversion. Chambers argues that summary judgment was improper because its settlement agreement with Coyote Excavating, Inc. (Coyote) does not preclude its claims against the Schmidts and there are genuine disputes of material fact. In response, the Schmidts argue that Chambers' claims are barred by judicial estoppel and the compulsory counterclaims doctrine.

We hold that (1) neither judicial estoppel nor the compulsory counterclaim doctrine bar Chambers' conspiracy and conversion claims, (2) Chambers' settlement agreement with Coyote does not preclude its claims against the Schmidts, (3) a genuine dispute of material fact exists such

that summary judgment was improper on Chambers' conversion claim, but (4) summary judgment was proper on the civil conspiracy claim. Therefore, we affirm summary judgment on the civil conspiracy claim and reverse summary judgment and remand for trial on the conversion claim.

FACTS

I. 2011 NEGLIGENCE ACTION

In February 2010, Chambers contracted with Coyote for the demolition phase of a project owned by Chambers at a former paper mill. Anthony[1] was the principal of Coyote. Coyote subcontracted much of the labor for the project to Dennis Zyph, an employee of Mica Creek Custom Homes LLC. Coyote demolished several structures that contained asbestos, contaminating large portions of the project site. In April 2011, Coyote quit Chambers' demolition project and left its equipment on Chambers' property. In September 2011, Chambers sued Coyote for negligence relating to the asbestos contamination seeking to recover the cleanup cost. Coyote counterclaimed for conversion of several pieces of equipment that it left at the project site when it walked off.[2] Chambers asserted that it was holding the construction equipment to set off the cost of cleaning up the asbestos contamination. Chambers and Coyote settled the negligence claim on June 21, 2013. The notice of settlement provided,

> "The parties have reached an agreement at mediation to a dismissal of the captioned action including all claims by plaintiff against defendant and all claims by defendant against plaintiff. The equipment currently in the possession of each party shall remain in the possession of each party. The parties through their respective

---

[1] We refer to Anthony and Charles Schmidt by their first names to avoid confusion when their individual actions are important, intending no disrespect.

[2] Coyote's counterclaim is not in the record but it is undisputed that it left equipment and that Chambers did not return it.

attorneys shall cause a Stipulated Dismissal with Prejudice, and without costs or attorney fees to be entered of record forthwith."

Clerk's Papers (CP) at 27.

## II. 2013 CONVERSION AND CIVIL CONSPIRACY ACTION

Anthony, as the principal of Coyote, prepared and signed a contract with Chambers that required Coyote to sell scrap metals from the demolition project exclusively to Metro Metals. While the negligence action was pending, Chambers discovered that Anthony had not sold all of the scrap metal to Metro Metals, but instead had sold some portion of the scrap metal to R.S. Davis and Seattle Iron & Metals. Tim Ralston, Chambers' manager at the demolition project, declared that neither he nor the subcontractor Zyph were involved in the sale of metals to R.S. Davis and Seattle Iron. Coyote had left the demolition project in April 2011 and Ralston claimed that in the fall of 2012, one of Coyote's employees notified him of Anthony's actions. Zyph declared that Anthony approached him within 10 days of beginning work on the project and asked him to be involved in a "side deal," which Zyph understood to mean to sell "metal from the Mill Site without the knowledge of the project owner, Chambers." CP at 66. Zyph declined to participate.

Charles is Anthony's father. Both Charles and Anthony admitted that they sold the scrap metal to R.S. Davis and Seattle Iron. However, both declared that selling the scrap metal elsewhere was part of Ralston's plan to generate more cash flow for the demolition project, and Charles stated that he learned after the sales that the metals were meant to be exclusively sold only to Metro Metals. When delivering the scrap metal to R.S. Davis, Charles presented a letter from Zyph purporting to authorize Charles to sell the scrap metal. Zyph declared that the letter was a forgery and Anthony declared that he signed Zyph's name on the authorization letter himself but that Zyph gave "consent over the phone." CP at 116.

3

Before Chambers and Coyote settled the negligence action there were several e-mail exchanges between the parties' attorneys that discussed Chambers' conversion and civil conspiracy claims against the Schmidts. In May 2013, Chambers filed suit against the Schmidts alleging civil conspiracy and conversion. The Schmidts moved for summary judgment, arguing that Chambers' claims were barred under theories of judicial estoppel and the requirement to assert compulsory counterclaims. The trial court granted summary judgment in the Schmidts' favor on both the conversion and civil conspiracy claims.[3] Chambers appeals.

ANALYSIS

First we review and reject the Schmidts' arguments regarding judicial estoppel and the compulsory counterclaim doctrine. Then, we turn to Chambers' argument that the settlement agreement does not bar its action against the Schmidts. Finally, we analyze whether a genuine dispute of material fact exists, thus rendering summary judgment on Chambers' conversion and civil conspiracy claims improper.

I. STANDARD OF REVIEW

We review the trial court's summary judgment order de novo. *Dean v. Fishing Co. of Alaska, Inc.*, 177 Wn.2d 399, 405, 300 P.3d 815 (2013). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A fact is "material" when it "'affects the outcome of the litigation.'" *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164, 273

---

[3] Chambers' amended complaint also included a claim for "civil theft." But Chambers abandoned this claim in its response to the Schmidts' summary judgment motion. CP at 41 ("Defendants appear to be correct in that 'civil theft' appears to be a subspecies of conversion.").

P.3d 965 (2012) (quoting *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005)). We engage in the same inquiry as the trial court, we view the facts in a light most favorable to Chambers, and we make all reasonable inferences from those facts in its favor as the nonmoving party. *Lyons v. U.S. Bank Nat'l Ass'n*, 181 Wn.2d 775, 783, 336 P.3d 1142 (2014). As the moving party, the Schmidts bear the initial burden of showing the absence of any genuine issue of material fact. *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013).

## II. JUDICIAL ESTOPPEL

The Schmidts argue that summary judgment was proper because Chambers is judicially estopped from alleging that the Schmidts converted the scrap metals because Chambers already alleged and settled their claim that Coyote converted metal from the mill project. We disagree that the Schmidts are entitled to summary judgment as a matter of law on the basis of judicial estoppel because the Schmidts have not established that Chambers took a clearly inconsistent position.

### A. RULES OF LAW

"'Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 861, 281 P.3d 289 (2012) (internal quotation marks omitted) (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)). "Three core factors" determine whether judicial estoppel applies: "(1) whether 'a party's later position' is 'clearly inconsistent with its earlier position'; (2) whether 'judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the

opposing party if not estopped.'" *Arkison*, 160 Wn.2d at 538-39 (internal quotation marks omitted) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)).

### B. CHAMBERS DID NOT TAKE A CLEARLY INCONSISTENT POSITION

Chambers' amended complaint in the negligence action against Coyote did not mention the scrap metal nor did it address possible claims for civil conspiracy and conversion. Instead, in its response to Coyote's summary judgment motion in the negligence action, Chambers stated that it would file a separate suit against the Schmidts personally for conversion. In its e-mail correspondence with Coyote's attorney, Chambers said it planned to name the Schmidts "personally on claims of conversion and civil conspiracy" and that it would file those claims separately. CP at 155.

Chambers' position during the negligence action was consistent with its position here—that the Schmidts are personally liable for conversion and civil conspiracy. *Arkison*, 160 Wn.2d at 538-39. Chambers intended to pursue those claims against the Schmidts personally and in a separate action. The Schmidts fail to show how Chambers took a clearly inconsistent position in the negligence action because Chambers did not previously claim conversion in the 2011 litigation. We hold that judicial estoppel does not bar Chambers from pursuing its conversion and civil conspiracy claims.

### III. COMPULSORY COUNTERCLAIMS UNDER CR 13(A)

Next, the Schmidts argue that summary judgment was proper because CR 13(a), the compulsory counterclaim rule, required Chambers to bring its conversion claim in its prior negligence action against Coyote. We disagree with the Schmidts.

A.  RULES OF LAW

In general, a party's failure to bring a compulsory counterclaim will bar a later action on that claim.  *Schoeman v. New York Life Ins. Co.*, 106 Wn.2d 855, 863, 726 P.2d 1 (1986).  CR 13(a) provides, in relevant part,

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Washington courts apply the "logical relationship" test to determine whether the claim and counterclaim arose out of the same transaction or occurrence.  *Schoeman*, 106 Wn.2d at 865-66. This test asks whether the claim is logically related to the potential counterclaim.  *Schoeman*, 106 Wn.2d at 865.

B.  ALLEGED CONVERSION AROSE OUT OF A DIFFERENT TRANSACTION OR OCCURRENCE

The Schmidts point to *their* 2011 counterclaim for conversion of Coyote's demolition equipment against Chambers and argues that under CR 13(a), Chambers was required to bring its claim for conversion of the scrap metal at the same time.  The Schmidts' argument fails.

The few facts about Coyote's counterclaim that are in the summary judgment record confirm that its claim against Chambers for conversion of its demolition equipment did not arise out of the same transaction or occurrence as the Schmidts' alleged scrap metal conversion.  In April 2011, Coyote quit Chambers' demolition project and left its equipment on Chambers' property.  Chambers refused to return it, claiming the equipment as an offset for the cost of cleaning the asbestos damage that Coyote caused.  In September 2011, Chambers sued Coyote for negligence relating to the asbestos contamination seeking to recover the cleanup cost, and Coyote

counterclaimed for the conversion of its equipment. It was not until a year later, in late 2012, that Chambers learned of the Schmidts' alleged scrap metal conversion. Additionally, Chambers did not receive documentation from Seattle Iron confirming the Schmidts' scrap metal sales until May 2013.

Chambers' scrap metal conversion claim against the Schmidts did not arise out of the same transaction as Coyote's counterclaim in the negligence action for conversion of its equipment; these claims were not logically related. Thus, CR 13(a) does not apply and Chambers was not required to bring its conversion claim as a counterclaim.

## IV. THE SETTLEMENT AGREEMENT

Chambers contends that the settlement agreement did not resolve its conversion and civil conspiracy claims against the Schmidts. We conclude that a material issue of fact exists regarding what claims were settled in the 2011 negligence action.

Here, as the moving party, it is the Schmidts' burden to demonstrate that there is no dispute of fact as to whether the settlement agreement resolved Chambers' conversion and conspiracy claims against them personally. *Kofmehl*, 177 Wn.2d at 594. The Schmidts fail to meet that burden.

The notice of settlement in the negligence action stated,

> "The parties have reached an agreement at mediation *to a dismissal of the captioned action* including all claims by plaintiff against defendant and all claims by defendant against plaintiff. The equipment currently in possession of each party shall remain in the possession of each party. The parties through their respective attorneys shall cause a Stipulated Dismissal with Prejudice, and without costs or attorney fees to be entered of record forthwith."

CP at 22 (emphasis added).

First, the notice of settlement does not explicitly resolve Chambers' conversion and conspiracy claims against the Schmidts. The notice of settlement plainly resolves all claims between Chambers and Coyote—the plaintiff and defendant in the negligence action. The Schmidts were not a party to the prior action and the settlement refers to dismissal of only the "captioned action." Further, there is no explicit reference to dismissal of the filed conversion and conspiracy cause of action in the notice of settlement.

Second, in its September 2011 amended negligence complaint, Chambers made no mention of its claims for conversion and conspiracy against the Schmidts, so settlement of "all claims by plaintiff against defendant" and "dismissal of the captioned action" does not necessarily include those claims. CP at 22.

Third, Chambers' counsel corresponded by e-mail with Coyote's counsel about the fact that it was considering a claim for conversion against the Schmidts personally in a separate action. One e-mail stated that "[b]oth Anthony and his father were involved in the unauthorized removal and sale of metal. We intend to name both personally on claims of conversion and civil conspiracy." CP at 155. In another e-mail, Chambers' counsel stated that his "client [was] still pondering his options on the conversion claim. If he elects to go forward, *I will file a separate action. I think your advice to keep the claims separate is well taken*." CP at 156 (emphasis added).

Both e-mails suggest that even as Chambers was litigating its negligence claim against Coyote, it intended to bring separate claims for civil conspiracy and conversion against the Schmidts personally. In contrast, the Schmidts argue that an email from October 2011 between Chambers and Anthony tends to show the threat of the conversion and conspiracy suit was used to

bring forth the settlement of the parties. At the very least, this raises a disputed fact as to whether the settlement agreement was intended to resolve the conversion and conspiracy claims.

In light of Chambers' pleadings, the language of the settlement agreement and the e-mail correspondence between the parties, the Schmidts have not met their initial burden to demonstrate that there is no dispute of fact as to whether the settlement agreement resolved Chambers' claims against them. Indeed, it seems reasonable to conclude that the settlement agreement was not intended to resolve Chambers' suit against the Schmidts. Accordingly, we agree with Chambers that summary judgment was improper on this basis.

## V. GENUINE ISSUES OF MATERIAL FACT

Chambers argues that summary judgment on its conversion claim and its civil conspiracy claim was inappropriate because genuine issues of fact exist. We agree in part.

### A. CONVERSION

Here, Chambers argues regarding its conversion claim that a genuine issue of material fact exists as to whether it authorized the Schmidts' scrap metal sales because Ralston, a Chambers' employee, and Zyph, a subcontractor, both declared that they did not approve the sale. The Schmidts argue that Zyph's and Ralston's declarations and Ralston's testimony were insufficiently specific about the Schmidts' scrap metal sales and contain no evidence that conversion actually took place. We agree with Chambers.

A claim of conversion requires the plaintiff to prove three elements: (1) that the Schmidts intentionally interfered with Chambers' property, the metal, (2) by taking the property or retaining it unlawfully, and (3) that the Schmidts thereby deprived Chambers, the rightful owner, of

possession. *Aldaheff v. Meridian on Bainbridge Island, LLC*, 167 Wn.2d 601, 619, 220 P.3d 1214 (2009).

Anthony, as the principal of Coyote, prepared and signed the contract with Chambers that required Coyote to sell scrap metals from the demolition project exclusively to Metro Metals. Anthony declared that he delivered the scrap metals to Seattle Iron personally and that he directed Charles to deliver scrap metals to R.S. Davis. From Anthony's own statements there is no dispute that (1) Chambers owned the scrap metals and (2) the Schmidts deprived Chambers of possession of the scrap metals when they sold the metals to Seattle Iron and R.S. Davis.

But whether the Schmidts sold the scrap metals unlawfully or whether they had Chambers' permission is a material disputed fact. This issue "'affects the outcome of th[is] litigation'" because if Chambers authorized the Schmidts' scrap metal sales to Seattle Iron and R.S. Davis, the Schmidts did not sell the scrap metals "unlawfully" and no conversion occurred. *Elcon Constr., Inc.*, 174 Wn.2d at 164 (quoting *Owen*, 153 Wn.2d at 789).

Zyph declared that Anthony asked him if he was interested in a "'side deal,'" which he understood to mean that they would be "selling metal from the Mill Site without the knowledge of the project owner, Chambers." CP at 66. Zyph declared further that the letter Charles presented to R.S. Davis was forged and that he never authorized that sale. Ralston also declared that he "did not authorize the sale of metal to either R.S. Davis or Seattle Iron [and that n]either [he], nor Mr. Zyph to [his] knowledge received any portion of the proceeds." CP at 137.

In contrast, the Schmidts declared that Ralston directed them to find another buyer for the scrap metal in order to improve cash flow for the demolition project. Anthony also testified that he did not forge Zyph's letter to R.S. Davis but signed it on Zyph's behalf with his authorization. These conflicting declarations and testimony confirm the existence of a genuine dispute as to whether Chambers authorized the Schmidts' scrap metal sales to R.S. Davis or Seattle Iron. Accordingly, summary judgment on this basis was improper.

## B. CIVIL CONSPIRACY CLAIM

Chambers argues that Charles's "involvement in removing metal" from the project site supports an inference that he was involved in the scrap metal conversion and therefore participated in a civil conspiracy. We disagree.

A civil conspiracy requires clear, cogent, and convincing proof that "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy." *Wilson v. State*, 84 Wn. App. 332, 350-51, 929 P.2d 448 (1996) (citing *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 528-29, 424 P.2d 290 (1967)). A suspicion or "commonality of interests is insufficient to prove a conspiracy." *Wilson*, 84 Wn. App. at 351 (citing *Corbit*, 70 Wn.2d at 529). If the facts and circumstances on which the plaintiff bases his claim of conspiracy are "as consistent with a lawful purpose as with an unlawful undertaking," the facts are insufficient to establish a conspiracy. *All Star Gas, Inc. of Wash. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000) (quoting *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wn.2d 762, 314 P.2d 625 (1957). When applying the clear, cogent, and convincing evidence standard in the summary judgment context, we must determine "whether, viewing the evidence in the light most favorable

12

to the nonmoving party, a rational trier of fact could find that the nonmoving party supported [its] claim with clear, cogent, and convincing evidence." *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008).

Here, there is evidence that Anthony directed Charles to deliver scrap metals to R.S. Davis and that Charles complied. Ralston testified that he saw Charles on the project site several times, that Charles told Ralston that he owned the equipment Anthony was using to complete the project, and that Anthony owed Charles some money for it.

Chambers relies on the fact that Charles drove scrap metals to R.S. Davis and that Coyote had financial problems as evidence of an agreement to commit civil conspiracy such that summary judgment was inappropriate. However, this argument ignores the burden of proof. A civil conspiracy must be proven by clear, cogent, and convincing evidence. *Wilson*, 84 Wn. App. at 350-51. Here, there is no evidence that Charles knew that Anthony had entered into a contract with Chambers to sell the scrap metal exclusively to Metro Metals. Without evidence that Charles knew the sale to R.S. Davis was unauthorized by Chambers there is no evidence that two or more persons combined to accomplish a lawful purpose by unlawful means. Although Anthony and Charles both participated in the sale of scrap metal to R.S. Davis, no rational trier of fact could conclude that there is clear, cogent, and convincing evidence that Charles and Anthony entered into an agreement to *unlawfully* convert the scrap metals. Therefore, the trial court properly granted summary judgment on the civil conspiracy claim.

No. 46898-1-II

In conclusion, we affirm the trial court's summary judgment order as to Chamber's civil conspiracy claim. But we reverse summary judgment as to Chambers' conversion claim and remand for trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

WORSWICK, J.

MELNICK, J.