980 P.2d 742 (1999)
138 Wash.2d 506
Dr. G. Andrew H. BENJAMIN, Appellant,
v.
WASHINGTON STATE BAR ASSOCIATION, an Agency of the State of Washington, Respondent.
Dr. G. Andrew H. Benjamin, Appellant,
v.
Dennis P. Harwick, in his individual capacity; and Rebecca Harwick, his wife, Respondents.
No. 66352-1.
Supreme Court of Washington, En Banc.
Argued October 21, 1998.
Decided July 22, 1999.
*744 Keating, Bucklin & McCormack, Stewart A. Estes, Seattle, Amicus Curiae on behalf of Washington Defense Trial Lawyers.
Jeffrey L. Needle, Seattle, Amicus Curiae on behalf of American Civil Liberties Union.
Abraham A. Arditi, Seattle, for Appellant.
Carolyn Cairns, Laura Buckland, Seattle, for Respondents.
*743 SMITH, J.
Appellant G. Andrew H. Benjamin seeks direct review of a King County Superior Court partial summary judgment which dismissed his claims that termination of his employment by the Washington State Bar Association violated his free speech rights under both the federal and state constitutions and of a summary judgment granting qualified immunity to Respondent Dennis P. Harwick, Executive Director of the Association. We granted review. We affirm.

QUESTIONS PRESENTED
The questions presented in this case are whether the trial court was correct in dismissing Appellant G. Andrew H. Benjamin's free speech claims and in granting Respondent Dennis P. Harwick qualified immunity on Appellant's free speech claims.

STATEMENT OF FACTS
On January 16, 1995, Appellant G. Andrew H. Benjamin filed in the King County Superior Court a complaint against Respondents Dennis P. Harwick, in his individual capacity, and Rebecca Harwick, his wife.[1] On August 1, 1995, Appellant filed in the King County Superior Court a complaint against the Washington State Bar Association.[2] Upon Appellant's motion, the cases were consolidated October 18, 1995.[3]
In his complaint against Respondents Harwick, Appellant claimed his termination as director of the Lawyer Assistance Program (LAP)[4] of the Washington State Bar Association (WSBA) by Respondent Dennis P. Harwick, at that time executive director of the WSBA, violated Appellant's free speech rights under the First Amendment of the United States Constitution, article I, Section 5 of the Washington State Constitution,[5] and 42 U.S.C. § 1983.[6] The First Amendment reads, "Congress shall make no law ... abridging the freedom of speech...." Article I, section 5 of the Washington Constitution provides "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." 42 U.S.C. § 1983 reads:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any *745 Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
In his complaint against the WSBA, Appellant contended that the WSBA violated article I, Section 5 of the Washington Constitution in not supporting a grant proposal he had submitted and in threatening not to accredit a Continuing Legal Education seminar if he participated in it after his termination.[7] Based on these actions, Appellant also asserted defamation and false light claims.[8]
Appellant was hired by the WSBA and on November 10, 1986 was assigned as director of the WSBA's Lawyer Assistance Program.[9] Dennis P. Harwick became executive director of the WSBA on December 1, 1990.[10] The LAP was created under Washington Court General Rule (GR) 12 which includes in its authorization to the WSBA maintaining, in its discretion, "a program for the aid and rehabilitation of impaired members[.]"[11] Through the LAP, counseling for attorneys is provided by WSBA-employed therapists, which included Appellant, who was also director of the LAP.[12]
Appellant Benjamin in his complaint asserted the LAP achieved "national prominence"[13] and that he had received positive performance appraisals.[14] He also claimed that, in September 1993, Respondent Harwick informed him he wanted the LAP to be "self-funding" in order not to "drain" the resources of the WSBA.[15] Appellant claimed Mr. Harwick wanted the LAP to increase its revenue fivefold from $10,000 to $50,000.[16] Appellant voiced his objection to Mr. Harwick concerning increasing LAP client fees to enhance revenues of the WSBA.[17] That objection is a central focus of this case. At a staff retreat in October 1993,[18] Appellant expressed his opposition to a fee increase to the LAP staff and later to the LAP Steering Committee.[19] The Steering Committee on November 4, 1993 unanimously voted against the fee increase.[20]
Appellant claimed that on November 5, 1993, the day following the meeting of the Steering Committee, he received from Mr. Harwick an unsatisfactory performance appraisal dated November 4, 1993 and was told he was being terminated and required to leave the office by April 30, 1994.[21] In the performance appraisal, Respondent Harwick wrote that Dr. Benjamin's termination would be immediate if he made an "end-run."[22]
Appellant filed two grievances with the WSBA Grievance Committee which unanimously rejected both.[23] Appellant claimed that after he filed his first grievance Mr. Harwick informed him his termination date *746 would be accelerated from April 30, 1994 to December 31, 1993.[24]
Appellant claimed in addition that, after his termination, the WSBA took retaliatory action against him by refusing to support a grant proposal he had submitted which Mr. Harwick previously had supported before the adverse employment decision.[25] Appellant also asserted that the employees of the WSBA told the chairperson of a CLE seminar Appellant could not participate, and, if he did participate, the WSBA would not give CLE credit for the seminar.[26] Appellant further claimed these comments by WSBA employees to the CLE seminar chairperson were further publicized, thus supporting his defamation and false light claims.[27]
Appellant Benjamin on January 16, 1995 filed claims in the King County Superior Court against Respondents Harwick and on August 1, 1995 against Respondent WSBA for violation of his free speech rights under 42 U.S.C. § 1983, the First Amendment of the United States Constitution, and article I, section 5 of the Washington Constitution; and for defamation and false light under article I, section 5 of the Washington Constitution. Among other things, he asked for compensatory and punitive damages and injunctive relief against all Respondents.[28]
On September 6, 1996, Respondents Harwick and the WSBA moved for partial summary judgment to dismiss Appellant's free speech claims under the federal and state constitutions and 42 U.S.C. § 1983.[29] Respondents contended there was no violation of the federal constitution and 42 U.S.C. § 1983 because there was no "action under the color of state law"[30] when Respondent Harwick terminated Appellant.[31] Respondents asserted that Mr. Harwick was acting as "the executive director of a privately funded organization, engaged in the internal business of managing its staff, as was his charge under the WSBA Bylaws."[32] Respondents further contended the issue was not a matter of public concern, a necessary requirement for determining constitutionally protected speech, even if the termination did constitute state action.[33] In addition, Respondents asserted Appellant was a "policymaker" and thus had more limits on his free speech as a public employee than he otherwise would have.[34]
Respondents also contended there was no violation of article I, section 5 of the Washington Constitution because there was no state action either when Mr. Harwick terminated Dr. Benjamin or in the post-termination actions Appellant claims the WSBA took against him as retaliation.[35]
In addition to the motion for partial summary judgment on the free speech claims, Respondents Harwick, on September 6, 1996, moved for dismissal of the complaint by a supplemental motion for summary judgment claiming qualified immunity.[36] They contended that at the time of Dr. Benjamin's termination the law was not clearly established that the termination constituted state action, nor was the law clearly established that Dr. Benjamin's speech was constitutionally protected.[37]
On November 8, 1996, the King County Superior Court, the Honorable Michael J. Trickey, granted both the motion for partial summary judgment on Appellant's free speech claims and Respondents Harwick's supplemental motion for summary judgment *747 under the doctrine of qualified immunity.[38] The court found as a matter of law that Dr. Benjamin's termination by Mr. Harwick did constitute state action[39] and that the matter of increasing fees for clients in the LAP program was one of public concern.[40] The court found, however, that "the WSBA's interest in managing its responsibilities outweighs the value of plaintiff's free speech interest."[41] In addition, the court determined that Dr. Benjamin was a "policymaker," and for that reason "his freedom of speech interests were overridden by the WSBA's interest in functioning effectively."[42]
In granting Mr. Harwick qualified immunity, the court found that, at the time of Dr. Benjamin's termination, the law was not "clearly established" that the WSBA was a "public entity for purposes of Benjamin's termination," nor was it clearly established that "Dr. Benjamin's speech was an issue of public concern protected by the state and federal constitutions."[43]
Appellant sought direct review by this Court which was initially denied on February 27, 1997 because the trial court's orders did not dispose of the entire lawsuit.[44] The defamation and false light claims were later settled and an order was entered dismissing those claims.[45] Appellant again sought direct review by this Court, which we granted on May 5, 1998. For purposes of this review, all Respondents agreed with Appellant's factual claim that he was terminated because he disagreed with the executive director of the WSBA about increasing fees for LAP clients and voiced his objections to other persons.[46]

DISCUSSION

STANDARD OF REVIEW
Under Civil Rule (CR) 56(c), a complaint may be dismissed on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dismissal under this rule involves a question of law which is reviewed de novo by an appellate court.[47] "This standard of review is consistent with the requirement that evidence and inferences are viewed in favor of the nonmoving party...."[48]

FREE SPEECH
The free speech rights of public employees under the First Amendment have been the subject of considerable attention by the courts.[49] It is "well-settled that the *748 government may not compel persons to relinquish their First Amendment right to comment on matters of public interest as a condition of public employment."[50] However, the United States Supreme Court since 1968 has recognized that the government has a legitimate interest "in promoting the efficiency of the public services it performs through its employees."[51] That the free speech rights of public employees must be weighed in the balance against the government's interest in efficient management of its tasks is a result of "the dual capacities created when the government and an individual assume an employment relationship. The government is concurrently a sovereign and an employer, while the individual is simultaneously a citizen and an employee."[52]
The public employee who claims a constitutional violation of the employee's free speech rights must demonstrate that the speech in question is entitled to constitutional protection.[53] Whether the speech is constitutionally protected is a question of law.[54] The United States Supreme Court "has been careful to avoid fashioning a bright-line rule establishing what constitutes protected speech in public employee First Amendment cases."[55]
Courts employ a four-part inquiry to establish whether there has been a free speech violation:
(1) The court "decides the threshold issue whether the speech involved ... [is] on a matter of public concern";[56]
(2) If the speech is on a matter of public concern, "the court decides whether the employee's interest in exercising [the employee's] right to freedom of speech is greater than the interest of the government in promoting efficiency in the public service it performs."[57] "Although the employee has the burden of showing that the speech is on a matter of public concern, courts generally ... require the employer to demonstrate that the discharge ... was justified because of the employer's need to promote efficiency in the workplace;"[58]
*749 (3) If the free speech interests of the public employee outweigh the government's interest in efficient management, the public employee must show the speech was a substantial motivating factor in the adverse employment of which the employee complains;[59] and
(4) If the public employee is able to meet the burden under part (3), then the public employer must demonstrate that the same decision would have been made even without the protected speech.[60]
While parts (1) and (2) of the inquiry are questions of law, parts (3) and (4) are questions of fact usually left to the finder of fact.[61]
Although there is no bright-line rule for determining what constitutes constitutionally protected speech, courts have nevertheless been given some guidance for balancing employees' free speech interests against the government's interests in having an efficient workplace. Factors which may be considered by courts include "whether the statement impairs discipline by superiors or harmony among co-workers, has detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."[62]
In addition, in Binkley v. City of Tacoma this Court observed that the employee's speech is not to be considered "in a vacuum," but the court must consider whether "`the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.'"[63] In that case the Court concluded "[t]he employer's interests are defined, therefore, by determining whether and to what extent the `manner, time and place' of the speech in question threatened to disrupt the regular operation of the workplace by either impairing discipline by supervisors, impairing harmony among co-workers, or interfering with the speaker's duties."[64]
Appellant's argument focuses on the trial court's determination that, even though Appellant's speech did involve a matter of public concern, the employer's interests in an efficient workplace outweighed Appellant's free speech interests. Appellant contends that Respondents "failed to offer a whit of evidence" on any of the factors courts must consider in balancing the public employee's interests against the interests of the government.[65] Appellant argues that Respondents must produce evidence that demonstrates "actual or potential" disruption of the workplace.[66] This Court stated in White v. State, however, "[a]ctual disruption need not be shown and deference is given to government predictions of harm."[67]
Because the United States Supreme Court has not drawn a bright-line, rule in public employee free speech cases, but instead has developed a balancing test, analysis in public employee free speech cases is fact-sensitive as stated in Pickering.[68] What *750 is clear is that the facts must be analyzed against a backdrop of deference to legitimate governmental interests.
Appellant cites Waters v. Churchill in support of the proposition that predictions of harm through disruption "must" be based upon a "substantial showing that the speech is, in fact, likely to be disruptive."[69] The Supreme Court in Waters, however, observed that "[i]n many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished."[70] In Waters, a discharged nurse brought action claiming her discharge violated the First Amendment. The Court, in finding her speech was not protected, stated:
[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.... [W]e have given substantial weight to government employers' reasonable prediction of disruption, even when the speech involved is on a matter of public concern.... [[71]]
Appellant contends that "the manner, time and place of Benjamin's speech suggest no potential for disruption."[72] In several places in the record, however, reference is made to a fiscal crisis the WSBA had experienced and was still experiencing. A former member of the WSBA Board of Governors and a member of the LAP Steering Committee at the time of the dispute referred to "budget problems."[73] For more than a year, the former member knew about "overall budget problems that were affecting the bar, in say, 1992 and 1993."[74] In the 1992 Employee Performance Appraisal for Dr. Benjamin, Mr. Harwick referred to the "significant budget deficit" and noted that "some triage would be necessary in light of our financial situation."[75] He added "If the dues rollback referendum passes, there will be considerable pressure on all programs to cut expenses."[76] Appellant himself mentioned the fiscal crisis three times in his own review comments in his 1993 Employee Performance Appraisal.[77] At the hearing on the motion before Judge Trickey, the judge asked "Is it reasonable management response, when you have your boss come to you and say, `We're in a financial crisis, okay? We've got this dues rollback; we've got to do this fivefold. [sic]'"[78] Counsel offered no objection before the trial court to these references to the "financial crisis" of the WSBA.[79]
In such a context, it is reasonable for the government employee to expect that certain disagreements, particularly disagreements over revenue-enhancing strategies, might likely have a detrimental effect on close working relationships for which personal loyalty and confidence are necessary. Appellant argues that a showing of actual and significant harm is necessary,[80] but the United States Supreme Court has articulated this standard to the contrary:
When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.[[81]]
Under this standard, it is not unreasonable for a government employer (in this case Mr. *751 Harwick and the WSBA) to believe that opposition by an employee (in this case Dr. Benjamin) to policies to enhance revenues during a time of a financial crisis would interfere with the regular operation of the Association.
Appellant contends that because he reported to the WSBA executive director for administrative matters and to the LAP Steering Committee for programmatic issues, his "duty of confidence or loyalty on programmatic issues ran to the LAP Steering Committee, not to the executive director."[82] The record indicates that under the WSBA Employee Handbook, Mr. Harwick as executive director had ultimate authority over hiring and termination, and could terminate an employee at will.[83] The executive director also had primary responsibility for administering the WSBA budget.[84] Although Dr. Benjamin had primary reporting responsibility to an advisory committee, it nevertheless stands to reason that the executive director was entitled to expect ultimate loyalty from Dr. Benjamin to the WSBA and its interests. The trial court addressed this when it stated: "[E]ven if Benjamin had two masters, there was one master that was greater and more significant, and that's Harwick...."[85]
In determining whether the government employer has demonstrated the need for loyalty and confidentiality from an employee, courts have examined whether the employee is a policy maker. In Dicomes v. State,[86] the executive secretary of the Washington Medical Disciplinary Board and Board of Medical Examiners claimed she was discharged for unauthorized release of certain information. Serving at the pleasure of the director of the Department of Licensing (DOL), she discovered information indicating that the DOL budget did not exclude expenditure of surplus funds accumulated in the DOL's medical disciplinary account. Her superiors disagreed when she proposed that the boards should be informed on the matter. She nevertheless revealed the information and was terminated.[87]
This Court stated in Dicomes: "[A] public employee's interest in freedom of speech may be overridden where the State shows a need for political loyalty and confidentiality of its employees who are vested with discretionary authority and policy-making responsibilities."[88] Among the factors to be considered in determining whether an employee is a policymaker, the Court listed "whether the speaker establishes priorities, develops programs, procures funding, conducts studies, controls a budget or prepares budget requests, and whether the speaker is given broad discretion and is relatively unsupervised in carrying out these responsibilities."[89] Examining the duties of the executive secretary, the Court determined she was a policymaker and that her free speech interests were outweighed by the DOL director's interest "in providing an effective and efficient public service, and in maintaining *752 a close working relationship with his appointed executive secretary...."[90]
Appellant Benjamin's own declaration that the director of the LAP does not make policy is the only support he provides for his contention that he was not a policy maker.[91] In the record, Appellant points out that he brought "national prominence" to the LAP.[92] A member of the LAP Steering Committee asserted that by November 1993 the LAP had achieved "national recognition" and gave Dr. Benjamin "principal credit," adding "he [Benjamin] was the program."[93] In describing the dual reporting function Dr. Benjamin had, this same Steering Committee member stated "[T]he program director directed the program and met with us to discuss and review the results of it and what implementations, changes, et cetera, he in those years felt indicated."[94]
At least two of the factors outlined in Dicomes are implicated in Dr. Benjamin's seeking funding for a study of job-related stress in women: procuring funding and conducting studies.[95] In addition, the dual reporting structure for Dr. Benjamin seems to have provided him with discretion. When asked why there was a dual reporting responsibility with the resulting "independence" for the LAP director, a member of the LAP Steering Committee explained this program, in contrast to other bar programs, involved a "health care professional,"[96] suggesting that the director of the LAP, as a health care professional, would require more discretion because of his expertise. The record before us supports a conclusion that Dr. Benjamin was a policy maker and owed a duty of loyalty to the WSBA and its executive director.
In addition to examining the time, manner and place of the speech in question and whether the speaker is a policymaker, this Court in Binkley observed: "Where the employee's speech is a matter of public concern in only a limited sense, the employer's burden of justification is lighter."[97] The speech in question in Binkley was a document described as a "Vote of No Confidence" which contained five charges against the employee's superior. The employee claimed he was reassigned to a less attractive job in retaliation for distributing the document.[98] The Court assumed, but did not decide, that the document constituted speech on a matter of public concern.[99] However, the Court determined that because the document primarily concerned the employee's personal interests regarding such issues as work assignment, management style, and office locations, it "involved matters of public concern in only a most limited sense."[100]
In Wilson v. State, the director of a state hospital pharmacy department claimed that his free speech rights had been violated when he was demoted after he made certain comments concerning his superiors' management.[101] The employee claimed his comments were a matter of public concern because they related to "the quality of care that State mental hospital patients receive...."[102] The Court agreed that the quality of patient care was a matter of public concern but determined the employee's speech was "not clearly connected to the *753 provision of quality patient care."[103] The Court stated that the employee
was not seeking to inform the public that the administration was derelict in serving Hospital patients. Rather, he was justifying his own actions and philosophy and attempting to protect his own actions and philosophy and attempting to protect his own position. Although the general topic of quality patient care is one of public import, the connection between that topic and Wilson's speech is tenuous.[[104]]
In White v. State, the Court concluded that the speech in question (a nurse's report of suspected abuse of nursing home patients) clearly was connected to a matter of public concern because to find otherwise would be "contrary to the public policy of the state as reflected in RCW 70.124 (abuse of nursing home patients)."[105]
The Wilson and White cases illustrate the difficulties in determining the public significance of an employee's speech. General Rule (GR) 12(b)(8) gives the WSBA authority to establish a program to help impaired attorneys. That program is not mandated. The administrative detail of determining how much to charge LAP clients is of less public concern than was the speech in White. The evidence in this case supports a conclusion that the speech of the employee, Dr. Benjamin, occurred within the context of a fiscal crisis of the WSBA and that the employee was a policy maker. From this we conclude that the trial court was correct in dismissing the free speech claims of Appellant. There was no constitutional violation when the interests of Appellant, as a public employee, are weighed against the interests of the public employer, WSBA. This overcomes Appellant's claim that the post-termination actions by the WSBA rose to the level of a constitutional violation even though those actions may seem vindictive to an outside observer. Appellant at any rate does not provide sufficient authority to support his claim of a constitutional violation.[106]

QUALIFIED IMMUNITY
The doctrine of qualified immunity limits the exposure of public officials to liability for damages under 42 U.S.C. § 1983.[107] Three policy reasons have been offered by the United States Supreme Court for the doctrine: (1) preventing the unfairness which could result if public officials were subject to lawsuits under constitutional law issues that often are unclear; (2) keeping public officials from being overdeterred in fulfilling their public responsibilities; and (3) preventing the imposition of substantial costs on individuals and government alike for constitutional torts.[108] State officials are protected by qualified immunity for alleged constitutional torts if their conduct does not violate clearly established law effective at the time of the alleged tort.[109]
The first step in this analysis is to determine whether a violation of a constitutional right has occurred.[110] In this case, the interests of the employer, WSBA, in efficient management outweigh Appellant Benjamin's free speech interests. Consequently, we need not address the second step in qualified immunity analysisdetermining whether the constitutional right allegedly violated was clearly established at the time the dispute arose. Qualified immunity is not invoked because there is no constitutional violation.

SUMMARY AND CONCLUSIONS
The King County Superior Court on summary judgment dismissed Appellant G. Andrew *754 H. Benjamin's free speech claims, finding that, while there was state action and that the speech involved a matter of public concern, the employer's interests in efficient management outweighed the employee's free speech interests. In addition, the trial court found that Appellant was a "policymaker." The court granted Respondent Dennis P. Harwick qualified immunity, finding that, at the time of the termination, the law was not clearly established that the action constituted state action and that the speech involved a matter of public concern.
An analysis of public employee free speech cases includes a balancing test first announced by the United States Supreme Court in 1968 in Pickering v. Board. of Education and elaborated upon in later cases. Courts must weigh the interests of the public employer in efficient management against the public employee's free speech interests. Several factors are to be considered, among them whether the speech has a detrimental effect on close working relationships where loyalty is necessary. The employer need not show actual effect, but only potential effect. These factors are to be considered within the context in which the dispute arose. Additionally, deference is to be given to governmental interests, particularly where the public employee is found to be a "policy maker."
Examining the evidence in the light most favorable to the nonmoving party leads us to the determination there is sufficient evidence on the record in this case to conclude that Appellant Benjamin's exercise of his right to speak would likely disrupt the workplace of the Washington State Bar Association at a time when cohesion was important. The termination of Appellant did not rise to the level of a constitutional violation. Consequently, we have only briefly commented on the issue of qualified immunity in this opinion.
We affirm the judgment of the King County Superior Court which dismissed on summary judgment Appellant G. Andrew H. Benjamin's complaints against the Washington State Bar Association and Dennis P. and Rebecca Harwick.
GUY, C.J., DURHAM, J., DOLLIVER and BROWN, J.P.Tems., concur.
JOHNSON, J. (concurring).
While I agree with the majority that Benjamin's constitutional claim fails as a matter of law, I do not agree the Washington State Bar Association (Bar Association) has met its burden of showing actual or potential disruption. See White v. State, 131 Wash.2d 1, 15, 929 P.2d 396 (1997) (government employer has burden of presenting evidence to show it was justified in restricting the employee's right to freedom of speech). Instead, I would hold Benjamin's termination did not violate his First Amendment rights because he was not speaking as a citizen on a matter of public concern. See Connick v. Myers, 461 U.S. 138, 142-43, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
The content, form, and context of the statement, as revealed by the whole record, determine whether an employee's speech addresses a matter of public concern. Connick, 461 U.S. at 147-48, 103 S.Ct. 1684; White, 131 Wash.2d at 11, 929 P.2d 396. This is a threshold determination to be decided by the court as a matter of law. White, 131 Wash.2d at 11, 929, P.2d 396. The employee bears the initial burden of establishing that the speech touches on a matter of public concern. Connick, 461 U.S. at 147, 103 S.Ct. 1684; Binkley v. City of Tacoma, 114 Wash.2d 373, 382, 787 P.2d 1366 (1990). If the employee fails to meet this burden, the inquiry ends. Wilson v. State, 84 Wash.App. 332, 341, 929 P.2d 448 (1996).
Here, it is undisputed Benjamin's speech concerned revenue increases to the Bar Association's Lawyer Assistance Program (LAP). Benjamin argues because "there is a widely acknowledged link between lawyer impairment and disciplinary problems, LAP addresses issues of public concern." Am. Br. of Appellant at 6. He argues without prevention or therapy, lawyer impairment affects the community at large and the administration of justice. Benjamin notes the significant correlation between client fees and the success of the LAP program and points to evidence in the record that suggests raising client fees fivefold would have jeopardized LAP's existence.
*755 The fact this court has acknowledged attorney discipline is primarily aimed at protecting the public, In re Disciplinary Proceeding Against Plumb, 126 Wash.2d 334, 340, 892 P.2d 739 (1995), does not necessarily transform every matter which may tangentially affect attorney discipline into an issue of public concern. Moreover, the question is not whether the LAP itself somehow addresses a matter of concern to the public  such as attorney discipline  but whether Benjamin's speech does, given its content, form, and context. See Wilson, 84 Wash. App. at 347, 929 P.2d 448 (speech that is only tenuously connected to a topic of public concern is not protected). Under the facts presented, I would hold as a matter of law Benjamin's speech did not address an issue of public concern and is not entitled to First Amendment protections.
I begin by noting, as Benjamin himself admits, that the LAP is not itself a part of the attorney disciplinary process, but is an "adjunct" to it. Indeed, as all parties agree, the Bar Association is not required to offer a counseling program such as the LAP at all, but does so entirely "in its discretion." GR 12(b)(8) (1995). Nor are lawyers who may be under disciplinary sanctions stemming from various impairments, such as substance abuse or depression, required to take part in the LAP. Participation is solely on a voluntary basis. Finally, lawyers "who [are] able to pay competitive rates for therapy [are] typically referred out." Clerk's Papers at 342 (Decl. of Dr. Andrew Benjamin). In sum, while the LAP is undoubtedly a worthwhile program, its connection to lawyer discipline is at best indirect, and then only to a limited extent.
In addition to the fact the LAP is itself only tangentially connected to lawyer discipline, the context of Benjamin's speech demonstrates nothing more than an internal disagreement over how the LAP should be funded. In his deposition, Benjamin testified the immediate dispute originated in a private lunch discussion with Dennis Harwick, then executive director of the Bar Association. At that time, Harwick suggested the LAP raise its revenues from approximately $10,000 per year to a "target" of $50,000. Benjamin responded, "that would be impossible to me given the nature of our indigent clients...." Clerk's Papers at 57. Subsequently, Benjamin invited Harwick to a LAP retreat at which Harwick again broached the topic of raising LAP revenues. According to Benjamin, "once again I expressed my disagreement with the notion of raising a significant amount of revenue from increasing, quote, user fees, unquote, and that is when we were directed to come up with some approaches to raise the money." Clerk's Papers at 58.
At a staff meeting the following week, which Benjamin described as "acrimonious," other members of the LAP staff "felt that lawyers could pay their, quote, fair share, unquote, and I went along with my staff more or less and I said, `If you guys really feel like you have clients who can pay more money, by all means.'" Clerk's Papers at 58. Accordingly, Benjamin "reluctantly went along with it" but insisted, "we've got to take it to the Steering Committee." Clerk's Papers at 59. (According to Benjamin, after the Steering Committee sided with him, Harwick fired him.).
It is clear from the above testimony that Harwick mandated nothing other than that the LAP staff consider ways of raising approximately $40,000 worth of revenue. The majority of Benjamin's own staff agreed that revenues could be raised without significantly undermining LAP. Benjamin reluctantly agreed. This cannot be characterized as anything more than an internal dispute over how best to deal with a tight financial situation. Contrary to Benjamin's argument, his speech is quite unlike that in Dicomes v. State, 113 Wash.2d 612, 782 P.2d 1002 (1989), where the plaintiff sought "`to bring to light actual or potential wrongdoing or breach of public trust....'" Dicomes, 113 Wash.2d at 625, 782 P.2d 1002 (quoting Connick, 461 U.S. at 148, 103 S.Ct. 1684). Nor, under any characterization of his speech, can it be said that Benjamin was making a statement regarding inefficiency in the management of a governmental entity. See Reply Br. of Appellant at 22 ("`[S]tatements regarding criminal misuse of public funds, wastefulness, and inefficiency in managing and operating government entities [are] matters of inherent *756 public concern'") (quoting Chateaubriand v. Gaspard, 97 F.3d 1218, 1222-23 (9th Cir. 1996) (quoting Voigt v. Savell, 70 F.3d 1552, 1562 (9th Cir.1995))).
In sum, the point of Benjamin's speech was not to expose or even oppose any political, social, or other matter of inherent public concern but to voice his opinion regarding an internal management question of how best to fund a worthwhile, albeit discretionary, Bar Association counseling program  a program which itself is only tenuously connected to the alleged public concern in this case: attorney discipline.
Accordingly, I would hold Benjamin's termination did not infringe his constitutionally protected interest in freedom of speech. I would, therefore, dismiss his constitutional claims as a matter of law.
MADSEN and TALMADGE, JJ., concur.
SANDERS, J. (dissenting).
The majority affirms summary judgment dismissal of Benjamin's suit, asserting, as a matter of law, his speech finds no protection in the First Amendment. But since Benjamin has alleged violation of his clearly established First Amendment right to speak, this suit cannot be barred by qualified immunity. Nor can his suit be dismissed on summary judgment when he has properly set forth facts in the record to support it. I would therefore recognize and defend Benjamin's right to proceed to trial against the Washington State Bar Association and its director and would reverse the trial court.

I.

No qualified immunity for violation of a clearly established right.
Harwick's threshold defense is qualified immunity.[1]Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("Until this threshold [qualified] immunity question is resolved, discovery should not be allowed.") (emphasis added). In certain situations public officials enjoy qualified immunity from claims arising from the violation of the constitutional rights of others. Qualified immunity is an affirmative defense and the burden is on the defendant to assert the defense. Gomez v. Toledo, 446 U.S. 635, 639-41, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The test is an objective one: a claim of qualified immunity will fail where the public official's conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. 2727; Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the `objective legal reasonableness' of the action."); Crawford-El v. Britton, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ("[D]efendant's subjective intent is simply irrelevant to that defense [of qualified immunity]."). It is not necessary for the specific action of the public official to have been previously declared unlawful, but merely for the unlawfulness of the action to have been objectively apparent under law preexisting the official's action:
The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.
Anderson, 483 U.S. at 640, 107 S.Ct. 3034. See also Harris v. Roderick, 126 F.3d 1189, 1203 (9th Cir.1997) ("[The plaintiff] need not present a factually similar case in order to show that his constitutional rights were clearly established."); Crawford-El, 118 S.Ct. at 1593 ("The objective standard, in contrast, raises questions concerning the *757 state of the law at the time of the challenged conduct.").
In addition to asserting a clearly established right, to survive a claim of qualified immunity a plaintiff must also allege the right asserted has been violated. Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is `clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). A claim of qualified immunity requires examination of the facts alleged by the plaintiff, not the facts as they may ultimately be found. Crawford-El, 118 S.Ct. at 1597 ("[to resolve the question of qualified immunity] the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law") (emphasis added).
But the majority erroneously frames the qualified immunity question as "whether a violation of a constitutional right has occurred." Majority at 753 (emphasis added) (citing Siegert, 500 U.S. at 232, 111 S.Ct. 1789). In Siegert the defendant was entitled to qualified immunity because the plaintiff simply failed to make sufficient allegations to establish a constitutional violation. Siegert, 500 U.S. at 233, 111 S.Ct. 1789 ("Siegert failed not only to allege the violation of a constitutional right that was clearly established at the time of Gilley's actions, but also to establish the violation of any constitutional right at all."). The majority's approach puts the cart before the horse because it requires a plaintiff to affirmatively prove a violation of a constitutional right to defeat a claim of qualified immunity, thereby requiring the litigation to reach the merits of factual determinations, and thus frustrating the purpose of the doctrine which is to operate as an immunity to suit rather than a defense to be asserted at trial. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("The entitlement [under the qualified immunity doctrine] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").
Clearly, qualified immunity is appropriate only where assertions of fact by the plaintiff do not rise to the level of a clearly established constitutional violation. E.g., Siegert, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (finding defendant entitled to qualified immunity since plaintiff failed to establish violation of clearly established constitutional right). There is no qualified immunity when: (1) the right asserted was clearly established at the time of the plaintiff's discharge, and (2) the plaintiff factually alleges a violation of that right. Therefore the question to be decided for the purpose of qualified immunity is whether at the time Harwick fired Benjamin it was clearly established his action was unconstitutional based on the facts asserted by Benjamin.
A. The First Amendment right of a public employee to speak on matters of public importance was clearly established before Benjamin's discharge.
The First Amendment right of public employees to speak and be free of workplace retaliation has been "clearly established" for 30 years since Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There the Supreme Court recognized no public employee relinquishes his or her First Amendment rights to speak on matters of public importance merely because their employer is the government. See also Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), superseded on other grounds by statute as stated in Rivera v. United States, 924 F.2d 948 (9th Cir.1991); Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Rankin v. McPherson, 483 U.S. 378, 384-85, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Therefore the First Amendment right of public employees to speak without job retaliation was clearly established by the Supreme Court long before it was laid out in four parts by this court in Binkley v. City of Tacoma, 114 Wash.2d 373, 787 P.2d 1366 (1990), and long before Benjamin was fired for speaking out:

*758 To determine if a public employer has violated a public employee's right to free speech, we employ a 4-step inquiry, each step of which must be satisfied. First, the public employee must establish that his speech dealt with a matter of public concern. Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); Pickering, [391 U.S.] at 568[, 88 S.Ct. at 1734]. Second, if the speech dealt with a matter of public concern, the public employee must prove that his interest in "commenting upon matters of public concern" is greater than the employer's interest in "promoting the efficiency of the public services it performs". Pickering, at 568[, 88 S.Ct. at 1734].[[2]] Third, the public employee must demonstrate that his speech was a substantial or motivating factor in the adverse employment decision of which he complains. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Hayes v. Chicago, 710 F.Supp. 239, 242 (N.D.Ill.1989). Finally, if the public employee is able to prove these three elements, the burden shifts to the employer to prove that it would have reached the same decision even in the absence of the employee's protected conduct. Mt. Healthy, [429 U.S.] at 287[, 97 S.Ct. at 576].
Binkley, 114 Wash.2d at 382, 787 P.2d 1366. The first two steps of this four-part analysis test whether an employee's speech is protected by the First Amendment and are, therefore, questions of law for this court to resolve. Rankin, 483 U.S. at 386 n. 9, 107 S.Ct. 2891. Steps three and four, however, are questions of fact to be determined by the fact finder. Binkley, 114 Wash.2d at 382, 787 P.2d 1366.
Because the contours of the right at issuein particular the Pickering balancing testare somewhat fact-specific, it has been argued it would be almost impossible for a public official to know in advance when a proposed act would violate an employee's rights. See Brewster v. Board of Educ., 149 F.3d 971, 979-80 (9th Cir.1998); Moran v. Washington, 147 F.3d 839, 847 (9th Cir. 1998). But even this reasoning does not automatically defeat such claims on qualified immunity grounds. Rather, qualified immunity directs the court to evaluate the facts as alleged in the plaintiff's complaint under the "clearly established" standard to determine whether the factual allegations, if proved, amount to a clearly established constitutional violation (step two of the qualified immunity analysis). Indeed the Pickering balancing test itself is "clearly established." Rankin, 483 U.S. at 386 n. 9, 107 S.Ct. 2891.
Although balancing an employee's right to speak against an employer's interest in an efficient workplace requires an examination of specific facts, the criteria for weighing those facts in balance have been well defined by the courts. See, e.g., Connick, 461 U.S. at 152-53, 103 S.Ct. 1684 (stating that the time, place, and manner of employee's speech is relevant to the Pickering balance); Wright v. Illinois Dep't of Children & Family Servs., 40 F.3d 1492, 1502 (7th Cir.1994) (stating that whether the speech impeded the employee's ability to perform his job responsibilities is relevant to the Pickering balance).
Therefore, under the qualified immunity defense as outlined in Harlow and Anderson, the general contours of a public employee's First Amendment rights are clear, whereas the Pickering balance is simply one element of what must be proved to demonstrate the constitutional right of a plaintiff has been violated. Our constitutional rights would be almost meaningless if they could be so easily defeated by simply observing every violation is necessarily factually unique in some respects. A public official is not entitled to immunity simply because he asserts the Pickering test is designed to weigh specific facts. Rather the issue is whether the balance of the facts alleged by the plaintiff produces genuine doubt as to whether or not a constitutional violation has occurred. This is evidenced by the many cases where a public employee has claimed employment retaliation for the exercise of First Amendment rights and appellate courts have rejected claims of qualified immunity at the outset. See, e.g., Chateaubriand v. Gaspard, 97 F.3d 1218 (9th Cir.1996); Hafley v. Lohman, 90 *759 F.3d 264 (8th Cir.1996); Kincade v. City of Blue Springs, 64 F.3d 389 (8th Cir.1995); Lambert v. Richard, 59 F.3d 134 (9th Cir. 1995); Tindal v. Montgomery County Comm'n, 32 F.3d 1535 (11th Cir.1994); Edwards v. Department of Transp., 66 Wash. App. 552, 832 P.2d 1332 (1992).
The contours of the right of public employees to speak freely under the First Amendment without employment retaliation were therefore clearly established as required by Harlow and Anderson before Harwick discharged Benjamin in 1993.
B. Benjamin alleges facts demonstrating a violation of his clearly established First Amendment rights.
To properly allege a violation of his First Amendment rights as a public employee Benjamin must make allegations sufficient to satisfy each of the four prongs of the test outlined in Binkley, 114 Wash.2d at 382, 787 P.2d 1366.
First, Benjamin must allege his speech dealt with a matter of public concern. Benjamin's speech related to the method of funding the Washington State Bar Association's Lawyer Assistance Program (LAP) which is designed to assist attorneys who are impaired in their ability to function professionally. Benjamin specifically alleges LAP is a matter of public concern (Clerk's Papers (CP) at 4) and the majority does not dispute this.[3]
Second, Benjamin must allege his speech is more important than his employer's interest in workplace efficiency. Benjamin alleges it was in fact Benjamin's role to take issues such as client fees to the LAP Steering Committee (CP at 387) and Harwick concedes in his deposition this was within the scope of Benjamin's duties. CP at 435. If Benjamin's free speech activity was part of his job description, the exercise of that duty to speak cannot, absent more, be outweighed by the employer's interest in efficiency. To the contrary, it is an aspect of efficiency. To remain silent when one is hired to speak defeats job performance, it does not enhance it.
Third, Benjamin must allege his speech was a substantial or motivating factor in the decision to fire him. Benjamin specifically alleges "Harwick decided to terminate Benjamin because of views Benjamin expressed on issues of public concern." CP at 5. This factor was stipulated by the parties and admitted by the majority. Majority at 747.
The fourth element of the test shifts the burden to the employer to show that it would have reached the same decision even in absence of the protected speech. This element cannot form a basis for qualified immunity because it burdens the employer to prove a factual matter. In any event, Benjamin's complaint alleges on November 4, 1993, Benjamin told the LAP Steering Committee about his disagreement with Harwick over LAP funding (CP at 4) and that Harwick's negative performance appraisal firing Benjamin was dated the same day. CP at 5. This connection between Benjamin's speech and the decision to fire him is sufficient to overcome the fourth element of the test for the purposes of the qualified immunity defense.
Benjamin therefore properly alleges a violation of a constitutional right that was clearly established before his discharge. The majority's suggestion Benjamin fails to overcome qualified immunity is in reality not based on qualified immunity at all but rather upon the majority's invasion of the jury's province to weigh disputed facts and inferences.

II.

Summary judgment cannot weigh disputed facts.
A determination that a defendant is not entitled to qualified immunity does not by itself mean the "clearly established" constitutional claim against him is factually supported. This is usually a matter for the trier of fact at trial. Summary judgment, however, requires us to view the evidence and *760 inferences therefrom in the light most favorable to the nonmoving party (in this case Benjamin), and then test the plaintiff's proof against the summary judgment standard set out in CR 56 ("The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").
Although the majority correctly states the standard to be applied on summary judgment (Majority at 747), it subverts that standard by concluding "there is sufficient evidence on the record in this case to conclude that Appellant Benjamin's exercise of his right to speak would likely disrupt the workplace of the Washington Bar Association." Majority at 754 (emphasis added). But weighing the "sufficiency" of the evidence is for the trier of fact, whereas the court's role on summary judgment is merely to determine if there is any evidence, or inference therefrom, which, if believed, would allow the nonmoving party to prevail.
In effect the majority turns the summary judgment standard of review on its head. When viewing the evidence in the light most favorable to the nonmoving party (Benjamin), we look not for evidence that the claim of the moving party (Washington State Bar Association) has merit, but rather whether the claim of the nonmoving party (Benjamin) has any evidence to support it. Contrary to the majority's analysis of prong two of the test (the Pickering balance test), the question is not whether there is evidence that Benjamin's speech was disruptive (the argument advanced by Washington State Bar Association, the party moving for summary judgment) but rather whether there is evidence his speech was not disruptive (Benjamin's argument).
The majority asserts Benjamin's speech was not protected by the First Amendment because under prong two of the four-part test for identifying the free speech rights of public employees, the Bar Association's interests in efficiency in the workplace outweigh Benjamin's free speech interests. Of course any employer has an interest in workplace efficiency, but that does not mean an employee undermines that efficiency by speaking out on matters of public concern.
The majority implicitly concedes not only that the Washington State Bar Association is a governmental entity (and therefore the conduct complained of was under "color of law" as required by 42 U.S.C. § 1983) but also that Benjamin's speech involved a matter of public concern, satisfying prong one of the four-part test. Indeed the majority seems to regard these propositions as so inherently self-evident that further discussion in its opinion is not merited. While I agree with the majority on these points, I will, however, apply the summary judgment standard to each prong of the four-part test summarized in Binkley.
First, viewing the evidence in the light most favorable to Benjamin, is there evidence to support Benjamin's claim that his speech dealt with a matter of public concern? Benjamin expressed opposition to a proposed five-fold increase in the level of fees charged by LAP. CP at 343. LAP offers help to attorneys who suffer from mental, alcohol, drug, or other health problems. CP at 340. The program is designed to prevent attorneys from becoming impaired in their work and to assist attorneys who are already impaired. CP at 340-41. The ultimate aim of LAP is therefore to prevent or reduce attorney disciplinary problems due to impairment, and as such the functioning of the program obviously raises the same issues of public concern that justify regulation of the bar in the first place. In re Discipline of Plumb, 126 Wash.2d 334, 340, 892 P.2d 739 (1995) (purpose of lawyer discipline is to protect public); CP at 364 (Sunset Review Report of the Lawyer's Assistance Program (WSBA's Budget & Audit Comm., 1993)) ("By acting to prevent deterioration of an attorney's proficiency, LAP provided an effective barrier to degradation of services to the point where malpractice, discipline or both, became inevitable. It is that public benefit which provided the theoretical underpinnings for the program, and which justify its continuation."). Indeed defendant Harwick admits that the purpose of the LAP is to protect the public. *761 CP at 429. There is ample evidence in the record that a five-fold increase in fees would have jeopardized LAP. CP at 212-13, 217-19, 343. As the majority implicitly concedes, there is substantial evidence to support a finding that Benjamin's opposition to the fee increase is speech that addresses an issue of public concern.
The concurrence asserts as a matter of law Benjamin's speech did not pertain to a matter of public concern, despite conceding that attorney discipline is of concern to the public. Concurrence at 755. The concurrence relegates the LAP to a mere "adjunct" to attorney discipline, Concurrence at 755, ignoring the description of LAP as "provid[ing] an effective barrier to degradation of services to the point where malpractice, discipline or both, became inevitable." CP at 364 (WSBA's Sunset Review Report of LAP, supra) (emphasis added). It logically follows that if discipline of attorneys who commit malpractice is important to the public interest, then a program that effectively prevents otherwise inevitable attorney malpractice must be at least as important to the public interest as the regulatory scheme of which it forms an essential part. Indeed the trial court found Benjamin's speech about LAP client fees to be of public concern "because any program dealing with impaired lawyers is a matter of public concern." CP at 608 (Order Granting Defs.' Mot. for Partial Summ. J. (Nov. 11, 1996)).
The concurrence also asserts "Benjamin's speech demonstrates nothing more than an internal disagreement over how the LAP should be funded." Concurrence at 755. But this assumes LAP will have funding and the disagreement was merely about the source of that funding not about the very lifeblood of this essential program. Not so. There is clear evidence in the record the five-fold increase in fees objected to by Benjamin would cause discontinuance of the LAP. CP at 212-13, 217-19, 343. Applying the summary judgment standard we must view the evidence in the light most favorable to the nonmoving party (Benjamin), recognizing there is evidence Benjamin's speech advocated continuance of the LAP program against a clear threat to its continued existence.
This is a matter of public concern and neither the majority nor the concurrence claims otherwise.
When compared to the standard set by other decisions, Benjamin's speech was clearly of public concern. Rankin v. McPherson, 483 U.S. 378, 380, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding isolated personal comment by a data-entry employee referring to assassination attempt on the United States President, "If they go for him again, I hope they get him" was a statement addressing a matter of public concern); Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (holding parts of a questionnaire dealing with morale and discipline in the workplace were not matters of public concern); Binkley v. City of Tacoma, 114 Wash.2d 373, 787 P.2d 1366 (1990) (holding an employee's written criticism of supervisor was of limited public concern). Benjamin's speech was not concerned with internal office matters like much of the questionnaire in Connick, nor was Benjamin merely dissatisfied with his supervisor as in Binkley. Neither was Benjamin's speech careless personal speculation on an assassination attempt as in Rankin; rather it concerned the future of an important publicly funded program. "The key here is that the plaintiff was not simply speaking to matters of personal interest, such as disputes over internal office affairs as in Connick." Dicomes v. State, 113 Wash.2d 612, 625, 782 P.2d 1002 (1989) (holding speech relating to budget of medical disciplinary board was of public concern).
Second, viewing the evidence in the light most favorable to Benjamin, is there evidence to show Benjamin's speech interest was greater than, or at least did not undermine, WSBA's interest in an efficient workplace? The majority focuses only on this second prong of the test, dismissing Benjamin's complaint because it concludes as a matter of law the Bar Association's interest in workplace efficiency "outweighs" Benjamin's interest in free speech, but without demonstrating how Benjamin's speech even arguably undermined that "efficiency." In so concluding, the majority gives "deference" to the Bar Association's assertions that Benjamin's speech had the potential to be disruptive *762 to working relationships in light of the Bar Association's "fiscal crisis." Majority at 749, 750. This deference is no more than a statement of blatant prejudice in favor of the government party, it undermines the purpose of the Civil Rights Act (42 U.S.C. § 1983),[4] which is to provide relief against government actors, and is abhorrent. Although it is not necessary for actual disruption of the workplace to occur before a state agency prevails in this balance, the deference the summary judgment standard affords is to the nonmoving party (Benjamin), not the Bar Association.
In Waters v. Churchill, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), after noting actual disruption was not necessary for the state to prevail in the Pickering balance, the Supreme Court reaffirmed the importance of free speech rights of public employees:
Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished.
Waters, 511 U.S. at 674, 114 S.Ct. 1878. The inquiry is therefore focused on whether, without dispute of fact, a specified and real threat of disruption justified the termination, not just a claim that such might be the case. Otherwise an employee's interest in free speech will always be defeated by the state agency which merely raises the specter of disruption, albeit without factual predicate.
Here the Bar Association failed to make even a "substantial showing," let alone a factually undisputed one, that Benjamin's speech was likely to disrupt. Although the record references the Bar Association's "financial crisis," such a "crisis" is not even arguably due to, or caused by, employee disruption but rather the age old problem of spending more than one earns. Remarks made by Benjamin (e.g., CP at 351, "assuming WSBA does not remain in financial trouble") do not even tend to demonstrate any disruptive behavior on his part but, to the contrary, demonstrate an acute awareness of financial reality and countervailing demands on scarce resources. It was appropriate, not disruptive, for Benjamin to recommend an allocation of scarce resources: mere disagreement cannot be the equivalent of disruption, especially if the employee's job description also contemplates an honest rendering of his professional opinion.
The majority asserts Benjamin's speech was likely to have a "detrimental effect on close working relationships for which personal loyalty and confidence are necessary" and this tips the Pickering balance in favor of the Bar Association. Majority at 750-751 (citing Connick, 461 U.S. at 151, 103 S.Ct. 1684). But such is not the only inference from this record, if it is a permissible inference at all. Connick involved a public employee who opposed a proposed transfer to a different department and circulated a questionnaire to other employees, primarily asking about their satisfaction with the way the office was run. After recognizing a need for deference to an employer's judgment for the preservation of close working relationships, the Supreme Court held: "We caution that a stronger showing [by the employer] may be necessary if the employee's speech more substantially involved matters of public concern." Connick, 461 U.S. at 152, 103 S.Ct. 1684. In contrast, Benjamin's speech clearly involved matters of more public concern than those raised in Connick (which were essentially concerned with internal office procedures). The Bar Association is therefore required to prove beyond factual dispute that Benjamin's speech disrupted close working relationships, as opposed to just putting a differing view on the table which his supervisor could evaluate, accept or reject. Merely claiming a relationship will be undermined does not mean that it is. Watters v. City of *763 Philadelphia, 55 F.3d 886, 897-98 (3d Cir. 1995).
Indeed, construing the record most favorably to Benjamin, there is no evidence to link his speech to any one of the disruptive factors weighing in favor of the state agency for the purposes of the Pickering balancing test. See White v. State, 131 Wash.2d 1, 15, 929 P.2d 396 (1997) ("Relevant factors which may be considered in the balancing analysis include (1) the time, place and manner of the employee's speech; (2) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (3) whether the employment relationship is one in which personal loyalty and confidence are necessary; and (4) whether the speech impeded the employee's ability to perform daily responsibilities.") (citations omitted).
Clearly for the purpose of summary judgment the Pickering balancing test must be resolved in favor of Benjamin since review of the evidence in the light most favorable to Benjamin demonstrates his speech was, in fact, not disruptive. If the Bar Association views disruption as synonymous with disagreement, this can only be so if the Bar Association will not tolerate any difference of opinion. But that is Harwick's problem, not Benjamin's, as government employees have a constitutional right to speak their minds on matters of public concern in a respectful, nondisruptive manner without fear of government violation.
Third, viewing the evidence in the light most favorable to Benjamin, is there evidence to support a finding that Benjamin's speech was a substantial or motivating factor in the decision to fire him? As discussed in the qualified immunity analysis, Dr. Benjamin's discharge was made known to him within a day of his report to the LAP Steering Committee, thus raising at least an inference that the two events were related. Furthermore this factor was stipulated to by the parties and admitted by the majority. Majority at 747. Benjamin has no difficulty overcoming this prong of the test on summary judgment.
For the fourth element of the test as set out in Binkley, the burden shifts to the employer to show that it would have reached the same decision despite the protected conduct. There is evidence in the record with which Benjamin could challenge such a showing by WSBA. The budget and audit committee of the WSBA prepared a report favorable to the LAP (CP at 363-65) and in his 1992 performance appraisal Benjamin was rated "outstanding" in almost every category. CP at 350. It was only when Benjamin voiced his objections about the proposed increase in LAP fees that he was given an unsatisfactory performance review. CP at 358.
Viewing the evidence in the light most favorable to Benjamin, it is clear that he has a valid claim against the WSBA and defendant Harwick for violation of his First Amendment rights.
The majority dismisses Benjamin's claims as not amounting to a First Amendment violation and therefore concludes Benjamin has no cause of action against the WSBA for violation of the state constitution[5] absent a demonstration the state constitution is more protective in this regard than its federal counterpart. Ipso facto, since I find Benjamin has stated a valid claim under the First Amendment I would consistently conclude he has a valid claim under the state constitution as well.
Since article I, section 5[6] of the state constitution provides greater protection than the First Amendment, O'Day v. King County, 109 Wash.2d 796, 802, 749 P.2d 142 (1988), *764 an action which violates the First Amendment must also violate the state constitution.[7] Although the state constitution does not explicitly include a mechanism for redressing violations of state constitutional rights, DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 142, 960 P.2d 919 (1998), where the constitution grants a right it is incumbent upon the judiciary to provide a remedy. Ever since Marbury v. Madison, the rule has been as Chief Justice John Marshall stated it: "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803). Such is particularly true with respect to state constitutional rights for unless they can be enforced these essential and fundamental rights are rendered merely theoretical.[8] I see no evidence our Founding Fathers desired to create a right without a remedy, especially in light of article I, section 29 ("[t]he provisions of this constitution are mandatory, unless by express words they are declared to be otherwise"). Mandatory means mandatory.

Conclusion
Viewing the evidence in the light most favorable to Benjamin, I find ample evidence to satisfy all the elements of the constitutional test as set out in Binkley and would protect Benjamin's exercise of his constitutional right to speak against violation by the Bar Association and its director. Therefore the summary judgment of dismissal must be reversed and this case should be remanded for trial by the trier of fact, not this appellate court, to determine whether the facts as may be found justify the relief for which Benjamin has prayed. I have no course but to dissent.
NOTES
[1] Clerk's Papers at 3 and 8.
[2] Id. at 620 and 626.
[3] Id. at 633-34.
[4] The WSBA Employee Handbook refers to the program as the Lawyer Assistance Program. Clerk's Papers at 43. It is also referred to in the record as the Lawyers' Assistance Program.
[5] Clerk's Papers at 7.
[6] Id. The federal Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a cause of action for damages against any person who, under color of law, subjects another to the deprivation of any right guaranteed under the United States Constitution. Allen K. Chen, The Burdens of Qualified Immunity: Summary Judgment and the Role of Facts in Constitutional Tort Law, 47 Am. U.L.Rev. 1, 10 (1997). In response to southern Black Codes, Congress enacted the Ku Klux Act in which this section originated. The Act was a means to enforce the 14th Amendment. Cristine Kuhn, Note, Between Scylla and Charybdis: Can the Supreme Court Rescue the Inimical Qualified Immunity Doctrine? 43 Drake L.Rev. 681, 683 (1995).
[7] Clerk's Papers at 623-24.
[8] Id. at 624-25.
[9] Id. at 3. Appellant Benjamin holds a J.D. degree and has been admitted to the Arizona State bar, but not the Washington State bar. Id. at 73. He also holds a Ph.D. degree in clinical psychology. Id. at 340.
[10] Id. at 249.
[11] GR 12(b)(14).
[12] Clerk's Papers at 341.
[13] Id. at 4.
[14] Id.
[15] Id. at 4.
[16] Id. at 57, 343.
[17] Id. at 58.
[18] The record indicates two different dates for the staff retreat, October 17, 1993 and October 19, 1993. Id. at 4 and 58.
[19] Id. at 58-59. Appellant described the LAP staff meeting as "very acrimonious" and stated that two of three staff supported increasing fees. Id. at 58. Appellant also stated that indigent lawyers made up "a lot" of his case load. Id. at 59.
[20] Id. at 59.
[21] Id. at 47-48, 361A. The comments by Dennis P. Harwick in Appellant's employee performance appraisal are dated November 3, 1993, the day before the Steering Committee meeting. The form shows it was given to Appellant on November 4, 1993. Id. at 361-361A.
[22] Id. at 361 A.
[23] Id. at 75-82, 295-300.
[24] Id. at 115.
[25] Id. at 367, 369.
[26] Id. at 185, 193-94.
[27] Id. at 24-25.
[28] Id. at 625, 8.
[29] Id. at 111-32, Defendants' Mot. for Partial Summ. J.
[30] Id. at 117.
[31] Id.
[32] Id. at 119.
[33] Id. at 126.
[34] Id. at 129-30.
[35] Id. at 125.
[36] Id. at 83-110.
[37] Id. at 85-87.
[38] Id. at 585, 590, Order Granting Def.'s Mot. for Partial Summ. J.
[39] Id. at 586.
[40] Id. at 587.
[41] Id.
[42] Id.
[43] Id. at 591, Order Granting Def.'s. Harwicks' Supplemental Mot. for Summ. J.
[44] Ruling Den. Review at 2-3.
[45] Clerk's Papers at 595.
[46] Br.of Resp't Washington State Bar Association at 48.
[47] Lamon v. McDonnell Douglas Corp., 91 Wash.2d 345, 349, 588 P.2d 1346 (1979).
[48] Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998).
[49] Appellant claimed protection under the free speech clauses of both the federal and Washington constitutions. The trial court granted defendants' [Respondents'] motion for partial summary judgment under both the federal and state constitutions. Clerk's Papers at 587. Appellant stated before this Court, however, that he was not asking us to interpret the state constitution "more broadly" than the federal free speech clause. Amended Br. of Appellant at 14 n. 6. It is sufficient to confine analysis of the claims against Respondents Harwick to the federal constitution. Appellant Benjamin's claim against the WSBA rested solely on the free speech clause of the Washington Constitution. Clerk's Papers at 624. Appellant acknowledged the WSBA could not be sued under 42 U.S.C. § 1983 because it is a state agency, but can be sued under article I, section 5 of the state constitution. Amended Br. of Appellant at 14 n. 6. Assertion of more rights under the Washington Constitution than under the federal constitution requires a Gunwall analysis. State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 538, 936 P.2d 1123 cert. denied, 522 U.S. 86, 118 S.Ct. 175, 139 L.Ed.2d 117 (1997). See also Br. of Amicus Curiae Washington Defense Trial Lawyers at 11. Appellant has not provided that analysis. We therefore do not address whether there is an implied cause of action under the free speech clause of the state constitution.
[50] Binkley v. City of Tacoma, 114 Wash.2d 373, 381, 787 P.2d 1366 (1990) (citing Pickering v. Board of Educ. of Tp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). This has not always been the case. For much of the twentieth century, the common understanding was that public employees could not object to restraints placed on the exercise of constitutional rights. "The classic formulation of this position was Justice Holmes, who, when sitting on the Supreme Judicial Court of Massachusetts, observed: `[A policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.'" Connick v. Myers, 461 U.S. 138, 143-44, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)(quoting McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892)). The understanding shifted in the 1950s and 1960s in the United States Supreme Court's loyalty oath cases. See Connick, 461 U.S. at 144, 103 S.Ct. 1684.
[51] Pickering, 391 U.S. at 568, 88 S.Ct. 1731.
[52] James G. Fahey, Notes and Comments, United States v. National Treasury Employees Union: Restrictions on Free Speech of Government Employees and the Re-balancing of Pickering, 15 St. Louis U. Pub.L.Rev. 555, 556 (1996).
[53] Wilson v. State, 84 Wash.App. 332, 340, 929 P.2d 448 (1996), review denied, 131 Wash.2d 1022, 937 P.2d 1103, cert. denied, 522 U.S. 949, 118 S.Ct. 368, 139 L.Ed.2d 286 (1997).
[54] Dicomes v. State, 113 Wash.2d 612, 624, 782 P.2d 1002 (1989).
[55] White v. State, 131 Wash.2d 1, 13, 929 P.2d 396 (1997).
[56] Id. at 11, 929 P.2d 396. See also Binkley, 114 Wash.2d at 382, 787 P.2d 1366; Connick, 461 U.S. at 147-48, 103 S.Ct. 1684. Respondents assign error to the trial court's threshold findings that termination of Appellant constituted state action and that the speech prompting termination was a matter of public concern. Br. of Resp't WSBA at 1. Under RAP 2.5(a), a party may raise a claim for "manifest error affecting a constitutional right" for the first time in the appellate court. Because of the conclusions we reach in this case we do not address that assignment of error.
[57] White, 131 Wash.2d at 11, 929 P.2d 396 (citing Waters v. Churchill, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); Rankin v. McPherson, 483 U.S. 378, 384-85, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).
[58] White, 131 Wash.2d at 14, 929 P.2d 396 (emphasis omitted) (citing Binkley, 114 Wash.2d at 383, 787 P.2d 1366).
[59] White, 131 Wash.2d at 16, 929 P.2d 396. See also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Binkley, 114 Wash.2d at 382, 787 P.2d 1366.
[60] Binkley, 114 Wash.2d at 382, 787 P.2d 1366.
[61] Id.
[62] Rankin, 483 U.S. at 388, 107 S.Ct. 2891.
[63] 114 Wash.2d at 384, 787 P.2d 1366 (quoting Rankin, 483 U.S. at 388, 107 S.Ct. 2891). See also Givhan v. Western Line Consolidated Sch. Dist. 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); Connick, 461 U.S. at 152-53, 103 S.Ct. 1684.
[64] James G. Fahey, Notes and Comments, United States v. National Treasury Employees Union: Restrictions of Free Speech of Government Employees and the Rebalancing of Pickering, 15 St. Louis U. Pub.L.Rev. 555, 566-67 (1996).
[65] Amended Br. of Appellant at 20.
[66] Id. at 14.
[67] White, 131 Wash.2d at 15, 929 P.2d 396. (Emphasis added.)
[68] 391 U.S. at 569, 88 S.Ct. 1731. "Balancing tests, like all legal standards, necessitate individualized, context-specific determinations of constitutional rights because the quantum of interests may vary substantially from case to case, even under the same constitutional provision." Allen K. Chen, The Burdens of Qualified Immunity: Summary Judgment and the Role of Facts in Constitutional Tort Law, 47 Am. U.L.Rev. 1, 45 (1997).
[69] 511 U.S. at 674, 114 S.Ct. 1878. Amended Br.of Appellant at 19.
[70] Waters, 511 U.S. at 674, 114 S.Ct. 1878. (Emphasis added.)
[71] Id. at 673, 114 S.Ct. 1878.
[72] Amended Br. of Appellant at 25.
[73] Clerk's Papers at 216.
[74] Id. at 218.
[75] Id. at 353.
[76] Id.
[77] Id. at 359-60.
[78] Tr. of Hr'g at 19.
[79] Id.
[80] Amended Br. of Appellant at 22.
[81] Connick, 461 U.S. at 151-52, 103 S.Ct. 1684.
[82] Amended Br. of Appellant at 22. Appellant argues that the dispute over whether to increase client fees was a programmatic issue. When asked if he considered increasing fees a programmatic issue, Mr. Harwick replied, "I believe that I would consider it a programmatic issue." Clerk's Papers at 279.
[83] Clerk's Papers at 43-44. Section I.F.2 of the WSBA Employee Handbook states: "The Board of Governors employs an Executive Director who is the chief of staff. The Executive Director has full administrative authority, including the authority to set staff/personnel policies, to set salaries, and to employ and terminate staff. The Executive Director's decision on all definitions and interpretations involving this Employee Handbook shall be final." Clerk's Papers at 43. Section I.W. states: "Termination may result at any time and for any reason not prohibited by law. Grounds for termination include, but are not limited to, violation of the provisions of the WSBA Employee Handbook, excessive absenteeism, failure to meet required work standards or objectives, dishonesty, disruptive behavior, inability to maintain proper working relationships, exceeding the limits of one's authority, and conduct prejudicial to the best interests of the WSBA." Clerk's Papers at 44.
[84] Id. at 256.
[85] Tr. of Hr'g at 38.
[86] 113 Wash.2d at 613-14, 782 P.2d 1002.
[87] Id. at 616, 782 P.2d 1002.
[88] Id. at 627, 782 P.2d 1002.
[89] Id. at 626, 782 P.2d 1002.
[90] Id. at 628, 782 P.2d 1002.
[91] Amended Br. of Appellant at 23.
[92] Clerk's Papers at 4.
[93] Id. at 209.
[94] Id. at 418-19. (Emphasis added.)
[95] Id. at 367. In Dr. Benjamin's 1993 Employee Performance Appraisal, Mr. Harwick mentioned five studies proposed by Dr. Benjamin. Id. at 361A.
[96] Id. at 419-20. The other reason given by the Steering Committee member for the dual reporting responsibility was to protect the confidentiality of the LAP. Id. at 420.
[97] Binkley, 114 Wash.2d at 383, 787 P.2d 1366.
[98] Id. at 377, 787 P.2d 1366.
[99] Id at 382-83, 787 P.2d 1366.
[100] Id. at 384, 787 P.2d 1366.
[101] 84 Wash.App. 332, 335-36, 929 P.2d 448 (1996), review denied, 131 Wash.2d 1022, 937 P.2d 1103, cert. denied, 522 U.S. 949, 118 S.Ct. 368, 139 L.Ed.2d 286 (1997).
[102] Id. at 343, 929 P.2d 448.
[103] Id. at 343, 929 P.2d 448 (citing Meyer v. University of Wash. 105 Wash.2d 847, 851, 719 P.2d 98 (1986)).
[104] Wilson, 84 Wash.App. at 347, 929 P.2d 448.
[105] 131 Wash.2d at 16, 929 P.2d 396.
[106] Clerk's Papers at 384-85, 460 and Reply Br. of Appellant at 19-20.
[107] Allen K. Chen, The Burdens of Qualified Immunity: Summary Judgment and the Role of Facts in Constitutional Tort Law, 47 Am. U.L.Rev. 1, 2, 10 (1997).
[108] Id. at 2.
[109] Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
[110] Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).
[1] The majority fails to recognize the nature of qualified immunity as a threshold defense which must be decided at the outset, analyzing the substance of Benjamin's claim before concluding "[q]ualified immunity is not invoked because there is no constitutional violation." Majority at 753. In structuring its analysis in this manner, the majority employs inverted logic. Qualified immunity is a threshold defense (an immunity from suit) which clearly must be analyzed first.
[2] Step two shall be referred to as the Pickering balancing test.
[3] Although the concurrence substantively addresses whether Benjamin's speech was a matter of public concern, it does not dispute that Benjamin alleges his speech is a matter of public concern. Concurrence at 754-755 (summarizing Benjamin's argument). The concurrence therefore implicitly agrees Benjamin's claim survives a qualified immunity analysis.
[4] The purpose of § 1983 is to "ensure that an individual had a cause of action for violations of the Constitution." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).
[5] Although Benjamin's cause of action against Harwick arises under 42 U.S.C. § 1983, Benjamin's claim against the WSBA for violation of his free speech rights is for violation of article I, section 5 of the state constitution only. CP at 624.
[6] Article I, section 5 states "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."
[7] In any event, Benjamin does not ask us to interpret the free speech provisions of the state constitution more broadly than the federal constitution. Therefore a Gunwall analysis is unnecessary. State v. Gunwall, 106 Wash.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986).
[8] Many states have recognized that citizens have a remedy for violation of state constitutional rights. E.g., Binette v. Sabo, 244 Conn. 23, 33, 710 A.2d 688 (1998) (holding state constitutional damages remedy exists); Brown v. New York, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996) (holding cause of action to recover damages exists as remedy for violation of state constitutional rights); Bott v. DeLand, 922 P.2d 732, 737-39 (Utah 1996) (holding state constitutional "unnecessary rigor" clause regarding cruel and unusual punishment created damages remedy); Gay Law Students Ass'n v. Pacific Tel. & Tel. Co., 24 Cal.3d 458, 595 P.2d 592, 602 n. 10, 156 Cal.Rptr. 14 (1979) ("The absence of such an administrative remedy, however, provides no justification for the judiciary to fail to enforce individual rights under the state Constitution."); Walinski v. Morrison & Morrison, 60 Ill.App.3d 616, 18 Ill.Dec. 89, 377 N.E.2d 242 (1978) (holding civil action for damages may be maintained for violation of state constitutional rights); Moresi v. State, 567 So.2d 1081, 1093 (La.1990) (In accepting the Bivens damage remedy, the court stated that "[r]ecovery of damages is the only realistic remedy for a person deprived of his right to be free from unreasonable searches and seizures."); Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 459 N.E.2d 453, 457 (1983) ("a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief"); Strauss v. State, 131 N.J.Super. 571, 330 A.2d 646, 649 (1974) ("our [state] courts do recognize tort actions based upon violations of an individual's constitutional rights"); Corum v. University of N. Carolina, 330 N.C. 761, 413 S.E.2d 276, 290 (1992) ("It is the state judiciary that has the responsibility to protect state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State ... Having no other remedy, our common law guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional freedom of speech."); Widgeon v. Eastern Shore Hosp. Ctr., 300 Md. 520, 479 A.2d 921 (1984) (holding common law action for damages available to enforce state constitutional rights); Woodruff v. Board of Trustees, 173 W.Va. 604, 319 S.E.2d 372 (1984) (mandamus with back pay available to enforce state constitutional rights).